# Exhibit A

*First Amended Complaint, Droesser, et al. v. Ford Motor Company*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| MARK WILLIAM DROESSER, JEFFREY A. FORD, JEFFREY FOWLKES, MATTHEW PARKER, and TREVOR WENTZ, individually and on behalf of themselves and all others similarly situated, | Cause No. 19-cv-12365 |
| | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| FORD MOTOR COMPANY, a Delaware corporation. | |
| Defendant. | |

## FIRST AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................1

II.   PARTIES .............................................................................10

    A.   The Plaintiffs ................................................................10

        Plaintiff Mark William Droesser .......................................... 10

        Plaintiff Jeffrey A. Ford, Sr. ............................................... 12

        Plaintiff Jeffery K. Fowlkes ............................................... 15

        Plaintiff Matthew Parker .................................................... 17

        Plaintiff Trevor Wentz ...................................................... 19

    B.   The Defendant ...............................................................22

III.  VENUE AND JURISDICTION .............................................22

IV.   FACTUAL ALLEGATIONS .................................................24

    A.   The Class Vehicles .........................................................24

    B.   The Rise of Diesel Vehicles in the United States...........24

    C.   Ford's Knowledge of Incompatibility, Defectiveness, and Failures Associated with Bosch's CP4 Pump When Used with American Diesel Fuel.............................................27

    D.   Ford Decides to Equip its Diesel Power Stroke Engines with the Bosch CP4 Pump.............................................40

    E.   Supposed "Remedies" are Insufficient and Costly.........59

    F.   Ford Knew Durability and Superiority Were Material to Consumers and Made Hollow Promises of Durability and Superiority.....................................................................61

G. Ford Designed, Manufactured and Sold Vehicles It Knew Would Experience Catastrophic Failures, Which Ford Would Not Repair or Address Under Its Warranties. ....82

H. Allegations Establishing Agency Relationship Between Manufacturer Ford and Ford Dealers .............................83

V. TOLLING OF THE STATUTE OF LIMITATIONS ..............88

VI. CLASS ACTION ALLEGATIONS .........................................92

VII. VII. CAUSES OF ACTION .....................................................97

A. Multi-state Claims ..........................................................97

COUNT I VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT 15 U.S.C. § 2301, *et. seq.* ........................97

B. Claims Brought on behalf of the Alabama Class Members ....................................................................104

COUNT I VIOLATIONS OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT (ALA. CODE § 8-19-1, *ET SEQ.*)........................................................................104

COUNT II FRAUDULENT CONCEALMENT (BASED ON ALABAMA LAW)................................................................109

COUNT III UNJUST ENRICHMENT............................................115

COUNT IV BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (ALA. CODE §§ 7-2-314) ..............117

C. Claims Brought on Behalf of the Alaska Class Members....................................................................119

COUNT I VIOLATIONS OF THE ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT (ALASKA STAT. ANN. § 45.50.471, *ET SEQ.*)...................119

COUNT II FRAUDULENT CONCEALMENT (BASED ON ALASKA LAW)..................................................................121

COUNT III  BREACH OF IMPLIED WARRANTY OF
MERCHANTIBILITY (ALASKA STAT. §§ 45.02.314) .....127

D.    Claims Brought on Behalf of the Arizona Class
Members ...................................................................130

COUNT I  VIOLATIONS OF THE ARIZONA CONSUMER
FRAUD ACT (ARIZ. REV. STAT. § 44-1521 *ET SEQ.*) .....130

COUNT II  FRAUDULENT CONCEALMENT (BASED ON
ARIZONA LAW)................................................................136

E.    Claims Brought on Behalf of the Arkansas Class
Members ...................................................................143

COUNT I  VIOLATIONS OF THE DECEPTIVE TRADE
PRACTICE ACT (ARK. CODE ANN. § 4-88-101 *ET
SEQ.*)......................................................................143

COUNT II  FRAUDULENT CONCEALMENT (BASED ON
ARKANSAS LAW) ...............................................................149

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (ARK. CODE ANN. §§ 4-2-314, 4-
2A-212)....................................................................157

F.    Claims Brought on Behalf of the Colorado Class
Members ...................................................................159

COUNT I  VIOLATIONS OF THE COLORADO CONSUMER
PROTECTION ACT (COLO. REV. STAT. § 6-1-101 *ET
SEQ.*)......................................................................159

COUNT II  FRAUDULENT CONCEALMENT (BASED ON
COLORADO LAW)................................................................166

COUNT III  UNJUST ENRICHMENT...........................................173

COUNT IV  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (COLO. REV. STAT. § 4-2-314)....175

G.    Claims Brought on Behalf of the Connecticut Class
Members ...................................................................177

COUNT I  VIOLATIONS OF THE CONNECTICUT UNFAIR
TRADE PRACTICES ACT (CONN. GEN. STAT. ANN. § 42-
110a *ET SEQ.*) ....................................................................177

COUNT II  FRAUDULENT NON-DISCLOSURE (BASED ON
CONNECTICUT LAW)...........................................................184

COUNT III  UNJUST ENRICHMENT...........................................191

    H.    Claims Brought on Behalf of the Delaware Class
Members......................................................................193

COUNT I  VIOLATIONS OF THE DELAWARE CONSUMER
FRAUD ACT (DEL. CODE ANN. tit. 6 § 2513 *ET SEQ.* and
§ 2532*)*...................................................................................193

COUNT II  FRAUDULENT CONCEALMENT (BASED ON
DELAWARE LAW) ...............................................................199

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (6 DEL. CODE § 2-314) .................206

    I.    Claims Brought on Behalf of the District of Columbia
Class Members .............................................................208

COUNT I  VIOLATIONS OF DISTRICT OF COLUMBIA'S
CONSUMER PROTECTION PROCEDURES ACT (D.C.
CODE § 28-3901, *ET SEQ.* ....................................................208

COUNT II  FRAUDULENT CONCEALMENT (BASED ON
DISTRICT OF COLUMBIA LAW) ......................................214

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (D.C. CODE § 28-:2-314)...............222

    J.    Claims Brought on Behalf of the Georgia Class
Members......................................................................224

COUNT I  VIOLATIONS OF GEORGIA'S FAIR BUSINESS
PRACTICES ACT (GA. CODE ANN. § 10-1-390 *ET.
SEQ.*).......................................................................................224

COUNT II  FRAUDULENT CONCEALMENT (BASED ON GEORGIA LAW).....................................................................229

COUNT III  UNJUST ENRICHMENT..........................................236

    K.    Claims Brought on Behalf of the Hawaii Class Members..................................................................238

COUNT I  UNFAIR AND DECEPTIVE ACTS IN VIOLATION OF HAWAII LAW (HAW. REV. STAT. § 480 *ET SEQ.*)..........238

COUNT II  FRAUDULENT CONCEALMENT (BASED ON HAWAII LAW).......................................................................244

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (HAW. REV. STAT. § 490:2-314) .252

    L.    Claims Brought on Behalf of the Idaho Class Members..................................................................254

COUNT I  VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT (IDAHO CODE § 48-601 *ET. SEQ.)*...254

COUNT II  FRAUDULENT CONCEALMENT (BASED ON IDAHO LAW).........................................................................260

COUNT III  UNJUST ENRICHMENT..........................................268

    M.    Claims Brought on Behalf of the Illinois Class Members..................................................................270

COUNT I  VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILL. COMP. STAT. 505/1 *ET. SEQ.*) ............................................270

COUNT II  FRAUDULENT CONCEALMENT (BASED ON ILLINOIS LAW)....................................................................276

COUNT III  UNJUST ENRICHMENT..........................................284

COUNT IV  BREACH OF THE IMPLIED WARRANTY FOR MERCHANTABILITY (810 ILL. COMP. STAT. 5/2-314) .285

N.   Claim Brought on Behalf of the Indiana Class
     Members ....................................................................288

COUNT I  VIOLATION OF THE INDIANA DECEPTIVE
     CONSUMER SALES ACT (IND. CODE § 24-5-0.5-3) .......288

COUNT II  FRAUD BY CONCEALMENT (BASED ON INDIANA
     LAW) ......................................................................293

COUNT III  UNJUST ENRICHMENT ...........................................300

COUNT IV  BREACH OF IMPLIED WARRANTY OF
     MERCHANTABILITY (IND. CODE § 26-1-2-314) ............301

O.   Claims Brought on Behalf of the Iowa Class
     Members ....................................................................304

COUNT I  CONSUMER FRAUDS ACTS IN VIOLATION OF
     IOWA LAW (IOWA CODE § 714H.1 *ET SEQ.*) ..................304

COUNT II  FRAUDULENT CONCEALMENT (BASED ON IOWA
     LAW) ......................................................................310

COUNT III  UNJUST ENRICHEMENT .........................................317

P.   Claims Brought on Behalf of the Kansas Class
     Members ....................................................................319

COUNT I  VIOLATIONS OF THE KANSAS CONSUMER
     PROTECTION ACT (KAN. STAT. ANN. § 50-623 *ET
     SEQ.*) .......................................................................319

COUNT II  FRAUDULENT CONCEALMENT (BASED ON
     KANSAS LAW) .................................................................327

COUNT III  BREACH OF IMPLIED WARRANTY OF
     MERCHANTABILITY (KAN. STAT. ANN. § 84-2-341) ...334

Q.   Claims Brought on Behalf of the Kentucky Class
     Members ....................................................................337

COUNT I  VIOLATIONS OF THE KENTUCKY CONSUMER
PROTECTION ACT (KY. REV. STAT. ANN. § 367.110 *ET
SEQ.*).........................................................................337

COUNT II  FRAUD BY CONCEALMENT (BASED ON
KENTUCKY LAW).................................................343

R.      Claims Brought on Behalf of the Louisiana Class
Members.....................................................351

COUNT I  VIOLATION OF THE LOUISIANA UNFAIR TRADE
PRACTICES AND CONSUMER PROTECTION LAW (LA.
STAT. ANN. § 51:1401 *ET SEQ.*).........................................351

COUNT II  FRAUDULENT CONCEALMENT (BASED ON
LOUISIANA LAW).................................................357

COUNT III  BREACH OF IMPLIED WARRANT OF
MERCHANTABILITY/WARRANTY  AGAINST
REDHIBITORY DEFECTS (LA. CIV. CODE ART. 2520,
2524).........................................................................364

S.      Claims Brought on Behalf of the Maine Class
Members.....................................................367

COUNT I  VIOLATION OF MAINE UNFAIR TRADE PRACTICES
ACT (ME. REV. STAT. ANN. TIT. 5, § 205A *ET. SEQ.*)....367

COUNT II  FRAUDULENT CONCEALMENT (BASED ON
MAINE LAW).......................................................372

COUNT III  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (ME. REV. STAT. ANN. TIT. 11, § 2-
314).........................................................................380

T.      Claims Brought on Behalf of the Maryland Class
Members.....................................................382

COUNT I  VIOLATIONS OF THE MARYLAND CONSUMER
PROTECTION ACT (MD. CODE ANN. COM. LAW. § 13-
101 *ET SEQ.*).........................................................382

COUNT II  FRAUDULENT CONCEALMENT (BASED ON MARYLAND LAW) ............................................................. 389

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (MD. CODE COM. LAW § 2-314) 396

    U.    Claims Brought on Behalf of the Massachusetts Class Members ...................................................................... 399

COUNT I  VIOLATIONS OF THE MASSACHUSETTS CONSUMER PROTECTION ACT (MASS. GEN. LAWS CH. 93A) ....................................................................................... 399

COUNT II  FRAUDULENT CONCEALMENT (BASED ON MASSACHUSETTS LAW) ................................................. 403

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (MASS. GEN. LAW CH. 106, § 2-314) ...................................................................................... 411

    V.    Claims Brought on Behalf of the Michigan Class Members ...................................................................... 413

COUNT I  VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT (MICH. COMP. LAWS § 445.901 *ET SEQ.*) ...................................................................................... 413

COUNT II  FRAUDULENT CONCEALMENT (BASED ON MICHIGAN LAW) ............................................................. 420

COUNT III  UNJUST ENRICHMENT ........................................... 428

COUNT IV  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (MICH. COMP. LAWS § 440.2314) ...................................................................... 429

    W.    Claims Brought on Behalf of the Minnesota Class Members ...................................................................... 432

COUNT I  VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT (MINN. STAT. § 325F.68 *ET SEQ.*) ...................................................................................... 432

COUNT II  FRAUDULENT CONCEALMENT (BASED ON MINNESOTA LAW) ............................................................438

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (MINN. STAT. § 336.2-314) ..........446

    X.    Claims Brought on Behalf of the Mississippi Class Members ....................................................................448

COUNT I  FRAUDULENT CONCEALMENT (BASED ON MISSISSIPPI LAW)................................................448

COUNT II  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (MISS. CODE ANN. § 75-2-314)...456

    Y.    Claims Brought on Behalf of the Missouri Class Members ....................................................................458

COUNT I  VIOLATIONS OF THE MISSOURI MERCHANDISING PRACTICES ACT (MO. REV. STAT. § 407.010 *ET SEQ.*).458

COUNT II  FRAUDULENT CONCEALMENT (BASED ON MISSOURI LAW)..................................................464

COUNT III  UNJUST ENRICHMENT...........................................471

COUNT IV  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (MO. REV. STAT. § 400.2-314) ....473

    Z.    Claims Brought on Behalf of the Montana Class Members ....................................................................476

COUNT I  VIOLATOIN OF MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT OF 1973 (MONT. CODE ANN. § 30-14-101 *ET SEQ.*)..............476

COUNT II  FRAUDULENT CONCEALMENT (BASED ON MONTANA LAW) ............................................................482

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (MONT. CODE § 30-2-314)...........490

AA.   Claims Brought on Behalf of the Nebraska Class Members ..................................................................492

COUNT I  VIOLATIONS OF THE NEBRASKA CONSUMER PROTECTION ACT (NEB. REV. STAT. § 59-1601 *ET SEQ.*)...............................................................................492

COUNT II  FRAUDULENT CONCEALMENT (BASED ON NEBRASKA LAW) ...............................................................499

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (NEB. REV. STAT. § 30-2-314) ....506

BB.   Claims Brought on Behalf of the Nevada Class Members ..................................................................509

COUNT I  VIOLATIONS OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT (NEV. REV. STAT. § 598.0903 *ET SEQ.*)...............................................................................509

COUNT II  FRAUDULENT CONCEALMENT  (BASED ON NEVADA LAW)...................................................................515

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (NEV. REV. STAT. § 104.2314)....523

CC.   Claims Brought on Behalf of the New Hampshire Class Members ..................................................................525

COUNT I  VIOLATION OF N.H. CONSUMER PROTECTION ACT (N.H. REV. STAT. § 358-A:1 *ET SEQ.*) ...............................525

COUNT II  FRAUDULENT CONCEALMENT (BASED ON NEW HAMPSHIRE LAW)..............................................................532

COUNT III  UNJUST ENRICHMENT...........................................540

COUNT IV  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.H. REV. STAT. ANN § 382-A:2-314)........................................................................................542

DD.   Claims Brought on Behalf of the New Jersey Class Members ..................................................................544

COUNT I  VIOLATIONS OF THE NEW JERSEY CONSUMER
    FRAUD ACT (N.J. STAT. ANN. § 56:8-1 *ET SEQ.*) ...........544

COUNT II  FRAUDulent concealment (based on new jersey law)..550

COUNT III  BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (N.J. STAT. ANN. § 12A:2-314)....558

    EE.   Claims Brought on Behalf of the New Mexico Class
        Members ....................................................................560

COUNT I  VIOLATIONS OF THE NEW MEXICO UNFAIR
    TRADE PRACTICES ACT (N.M. STAT. ANN. § 57-12-1 *ET*
    *SEQ.*)........................................................................560

COUNT II  FRAUDULENT CONCEALMENT (BASED ON NEW
    MEXICO LAW) ....................................................567

COUNT III  BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (N.M. STAT. ANN. § 55-2-314) ....574

    FF.   Claims Brought on Behalf of the New York Class
        Members ....................................................................577

COUNT I  VIOLATIONS OF NEW YORK GENERAL BUSINESS
    LAW § 349 (N.Y. GEN. BUS. LAW § 349).........................577

COUNT II  VIOLATIONS OF NEW YORK GENERAL BUSINESS
    LAW § 350 (N.Y. GEN. BUS. LAW § 350).........................583

COUNT III  FRAUDULENT CONCEALMENT (BASED ON NEW
    YORK LAW) ......................................................588

COUNT IV  UNJUST ENRICHMENT .........................................596

COUNT V  BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (N.Y. U.C.C. § 2-314)....................597

    GG.   Claims Brought on Behalf of the North Carolina Class
        Members ....................................................................600

COUNT I  VIOLATIONS OF THE NORTH CAROLINA UNFAIR
AND DECEPTIVE ACTS AND PRACTICES ACT (N.C.
GEN. STAT. § 75-1.1 *ET SEQ.)* ............................................600

COUNT II  FRAUDULENT CONCEALMENT (BASED ON
NORTH CAROLINA LAW) ..................................................606

COUNT III  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (N.C. GEN. STAT. § 25-2-314)......613

HH.   Claims Brought on Behalf of the North Dakota Class
Members ........................................................................616

COUNT I  VIOLATION OF THE NORTH DAKOTA CONSUMER
FRAUD ACT (N.D. CENT. CODE § 51-15-01 *ET SEQ.*) ....616

COUNT II  FRAUDULENT CONCEALMENT (BASED ON
NORTH DAKOTA LAW) ......................................................623

COUNT III  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (N.D. CENT. CODE § 41-02-31) ...630

II.   Claims Brought on Behalf of the Ohio Class
Members ........................................................................633

COUNT I  VIOLATIONS OF THE OHIO CONSUMER SALES
PRACTICE ACT (OHIO REV. CODE § 1345.01 *ET SEQ.)* 633

COUNT II  FRAUDULENT CONCEALMENT (BASED ON OHIO
LAW) ....................................................................................640

COUNT III  BREACH OF IMPLIED WARRANTY IN TORT .....647

JJ.   Claims Brought on Behalf of the Oklahoma Class
Members ........................................................................649

COUNT I  VIOLATION OF OKLAHOMA CONSUMER
PROTECTION ACT (OKLA. STAT. TIT. 15 § 752 *ET
SEQ.*)....................................................................................649

COUNT II  FRAUDULENT CONCEALMENT (BASED ON
OKLAHOMA LAW) ............................................................657

COUNT III  BREACH OF IMPLIED WARRANTY OF
      MERCHANTABILITY (OKLA. STAT. ANN. § 12A-2-
      314) ...................................................................................664

    KK.   Claims Brought on Behalf of the Oregon Class
          Members ....................................................................667

COUNT I  VIOLATIONS OF THE OREGON UNLAWFUL TRADE
      PRACTICES ACT (OR. REV. STAT. § 646.605, *ET SEQ.)* 667

COUNT II  FRAUDULENT CONCEALMENT (BASED ON
      OREGON LAW) ....................................................................674

COUNT III  BREACH OF IMPLIED WARRANTY OF
      MERCHANTABILITY (OR. REV. STAT. § 72-3140) ........681

    LL.   Claims Brought on Behalf of the Pennsylvania Class
          Members ....................................................................684

COUNT I  VIOLATIONS OF THE PENNSYLVANIA UNFAIR
      TRADE PRACTICES AND CONSUMER PROTECTION
      LAW (73 P.S. § 201-1 *ET SEQ.)* ...........................................684

COUNT II  FRAUDULENT CONCEALMENT (BASED ON
      pENNSYLVANIA LAW) .......................................................691

COUNT III  UNJUST ENRICHMENT ...........................................698

COUNT IV  BREACH OF IMPLIED WARRANTY OF
      MERCHANTABILITY (13 PA. CONS. STAT. ANN.
      § 2314) ................................................................................700

    MM.  Claims Brought on Behalf of the Rhode Island Class
          Members ....................................................................703

COUNT I  VIOLATION OF THE RHODE ISLAND UNFAIR
      TRADE PRACTICES AND CONSUMER PROTECTION
      ACT (R.I. GEN. LAWS § 6-13.1 *ET SEQ.)* ..........................703

COUNT II  FRAUDULENT CONCEALMENT (BASED ON
      RHODE ISLAND LAW) ........................................................710

COUNT III  UNJUST ENRICHMENT ...........................................718

COUNT IV  BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (R.I. GEN. LAWS § 6A-2-314) ...... 719

    NN.   Claims Brought on Behalf of the South Carolina Class
          Members .................................................................... 722

COUNT I  VIOLATIONS OF THE SOUTH CAROLINA UNFAIR
    TRADE PRACTICES ACT (S.C. CODE ANN. § 39-5-10 *ET
    SEQ.*) ......................................................................... 722

COUNT II  VIOLATIONS OF THE SOUTH CAROLINA
    REGULATION OF  MANUFACTURERS, DISTRIBUTORS,
    AND DEALERS ACT (S.C. CODE ANN. § 56-15-10 *ET
    SEQ.*) ......................................................................... 729

COUNT III  FRAUDULENT CONCEALMENT (BASED ON
    SOUTH CAROLINA LAW) .................................................. 731

COUNT IV  BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (S.C. CODE ANN. § 36-2-314) ...... 738

    OO.   Claims Brought on Behalf of the South Dakota Class
          Members .................................................................... 741

COUNT I  VIOLATIONS OF SOUTH DAKOTA DECEPTIVE
    TRADE PRACTICES AND CONSUMER PROTECTION
    LAW (S.D. CODIFIED LAWS § 37-24-1 *ET SEQ.*) ............. 741

COUNT II  FRAUDULENT CONCEALMENT (BASED ON
    SOUTH DAKOTA LAW) ...................................................... 747

COUNT III  BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (S.D. CODIFIED LAWS § 57A-2-
    314) ............................................................................ 754

    PP.   Claims Brought on Behalf of the Tennessee Class
          Members .................................................................... 757

COUNT I  VIOLATIONS OF THE TENNESSEE CONSUMER
    PROTECTION ACT (TENN. CODE ANN. § 47-18-101 *ET
    SEQ.*) ......................................................................... 757

COUNT II FRAUDULENT CONCEALMENT (BASED ON
    TENNESSEE LAW) ............................................................764

COUNT III BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (TENN. CODE ANN. § 47-2-314) .771

    QQ.   Claims Brought on Behalf of the Utah Class
        Members ...................................................................774

COUNT I VIOLATIONS OF THE UTAH CONSUMER SALES
    PRACTICES ACT (UTAH CODE ANN. § 13-11-1 *ET*
    *SEQ.*)........................................................................774

COUNT II FRAUDULENT CONCEALMENT (BASED ON UTAH
    LAW)......................................................................781

COUNT III BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (UTAH CODE ANN. § 70A-2-
    314)......................................................................788

    RR.   Claims Brought on Behalf of the Vermont Class
        Members ...................................................................791

COUNT I VIOLATION OF VERMONT CONSUMER FRAUD
    ACT (VT. STAT. ANN. TIT. 9, § 2451 *ET SEQ.*) ...............791

COUNT II FRAUDULENT CONCEALMENT (BASED ON
    VERMONT LAW) ...............................................................797

COUNT III BREACH OF IMPLIED WARRANTY OF
    MERCHANTIBILITY (VT. STAT. ANN. TIT. 9A § 2-314.804

    SS.   Claims Brought on Behalf of the Virginia Class
        Members ...................................................................807

COUNT I VIOLATIONS OF THE VIRGINIA CONSUMER
    PROTECTION ACT (VA. CODE ANN. § 59.1-196 *ET*
    *SEQ.*)........................................................................807

COUNT II FRAUDULENT CONCEALMENT (BASED ON
    VIRGINIA LAW)...............................................................814

COUNT III  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (VA. CODE ANN. § 8.2-314) ........821

    TT.   Claims Brought on Behalf of the Washington Class
Members ......................................................................824

COUNT I  VIOLATION OF THE WASHINGTON CONSUMER
PROTECTION ACT (WASH. REV. CODE ANN. § 19.86.010
*ET SEQ.*) ...................................................................824

COUNT II  FRAUDULENT CONCEALMENT (BASED ON
WASHINGTON LAW) ..........................................................830

COUNT III  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (WASH. REV. CODE ANN. § 62a.2-
314) ...........................................................................838

    UU.   Claims Brought on Behalf of the West Virginia Class
Members ......................................................................840

COUNT I  VIOLATIONS OF THE WEST VIRGINIA CONSUMER
CREDIT AND PROTECTION ACT (W. VA. CODE § 46A-1-
101 *ET SEQ.*) .........................................................840

COUNT II  FRAUDULENT CONCEALMENT (BASED ON WEST
VIRGINIA LAW) ................................................................846

COUNT III  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (W. VA. CODE § 46-2-314) ...........854

    VV.   Claims Brought on Behalf of the Wisconsin Class
Members ......................................................................856

COUNT I  VIOLATIONS OF THE WISCONSIN DECEPTIVE
TRADE PRACTICES ACT (WIS. STAT. § 110.18) ............856

COUNT II FRAUDULENT CONCEALMENT (BASED ON
WISCONSIN LAW) ..............................................................862

    WW. Claims Brought on Behalf of the Wyoming Class
Members ......................................................................870

COUNT I  VIOLATIONS OF THE WYOMING CONSUMER
      PROTECTION ACT (WYO. STAT. ANN. § 40-12-101 *ET
      SEQ.*)..........................................................................870

COUNT II  FRAUDULENT CONCEALMENT (BASED ON
      WYOMING LAW)...............................................................872

COUNT III  BREACH OF IMPLIED WARRANTY OF
      MERCHANTABILITY (WYO. STAT. ANN. § 34.1-2-
      314)...............................................................................880

PRAYER FOR RELIEF .................................................................882

DEMAND FOR JURY TRIAL ........................................................883

PLAINTIFFS MARK WILLIAM DROESSER, JEFFREY A. FORD, JEFFERY FOWLKES, MATTHEW PARKER, and TREVOR WENTZ, each individually and on behalf of all others similarly situated in the Class, file this First Amended Class Action Complaint against Defendant Ford Motor Company. This lawsuit is based upon the investigation of counsel, the review of scientific and automotive industry papers, and the investigation of experts with relevant education and experience. In support thereof, Plaintiffs state as follows:

## I. INTRODUCTION

1. Ford Motor Company has sold—and continues to sell—hundreds of thousands of diesel trucks equipped with high-pressure fuel injection pumps that are proverbial ticking time bombs, wholly unbeknownst to an unassuming American public willing to pay a (falsely predicated) premium for vehicles with fictitious "durability," "longevity," and "topnotch fuel economy." Ford promised consumers the continued reliability of their diesel engines with increased power at greater fuel efficiency. However, this came with a hidden-but-material defect, which was deceptively passed on to consumers. The heart of the problem is the Bosch-supplied CP4 high-pressure fuel injection pump, which powers the high-pressure fuel injection system in 2011 to present Ford vehicles with 6.7L Power Stroke diesel engines (the "Class Vehicles"), and which unbeknownst to American consumers is incompatible with U.S. diesel fuel.

2.      The design of the CP4 pump is fundamentally flawed in several respects.  While cheap and simple, the design is also extremely fragile and susceptible to failure caused by normal and expected U.S. diesel fuel quality, as well as its own expected wear and gradual disintegration, which scatters wear fragments into the fuel it relies on for lubrication.

3.      The CP4 lacks appropriate design margins.  It was originally designed for European lubricity levels (HFRR 460 scar), and Ford actually lobbied domestically for diesel fuel with even greater lubricity (400 scar) so that it could withstand its pump design.  But that never became a reality in the United States.  Instead, the United States adopted a lubricity standard of 520 scar for its Ultra Low Sulfur Diesel (ULSD), a level that Bosch's Assessed Pump Wear Rating chart (for pumps that rely on fuel for lubrication) describes as the edge of fatal breakdown.  U.S. diesel also allows for greater water content than European diesel, which can further reduce its lubricity.  And Ford's CP4 fuel pump design and testing did not take into account the realities of U.S. Biodiesel (including B-20), whose fuel qualities, including lubricity, are unstable and variable.  Thus, the CP4 was not designed or proven to be durable with real world U.S. diesel.[1]

---

[1] *See, e.g.*, FORD_DIESEL_00051880, at -1884 (Bosch testing plan for the CP4 fuel pump sent to Ford on June 20, 2007, stating that ███████████████████████████████
████████████ FORD_DIESEL_00052471, at -2480 (May 30, 2012 presentation regarding
████████████████████████████████████████████████████
████████████████████

4.     The CP4 design depends on a roller pin on cam drive, which is a radical change from the design of its predecessor, the CP3, which had a proven roller slider on polygon eccentric drive.  The roller pin design creates extreme Hertz contact stresses and bearing loads at the roller-to-cam interfaces.  The CP4 relies on the fuel itself for lubrication, but these extreme forces impair its ability to maintain even the minimum fuel film thickness needed for lubrication.  The roller follower shoe further scrapes lubrication from the roller pin as it turns.  The low volume of fuel and high pressures at which the CP4 operates can lead to cavitation and the complete loss of lubrication. Normal seasonal or geographic variations in fuel lubricity and water content also result in lower lubricity than the CP4 requires to delay fatal breakdown.  The extreme forces and poor lubrication of its design result in the accumulation of wear particles and/or degradation of the fuel inside the pump. Corrosion products from normal U.S. diesel fuel can also accelerate the occurrence of the CP4 pump's catastrophic failure.

---

FORD DIESEL 00057419 (Oct. 1, 2012 letter from Bosch to Ford

5. The CP4's roller bearing is particularly susceptible to malfunction and accelerated wear. The roller bearing lacks any detent or anti-rotation mechanism to prevent it from turning out of alignment with the rotating cam shaft. The tiniest contaminants, whether produced by the CP4 as wear particles, or those that may be found or develop in the fuel itself, can easily cause the roller bearing to become stuck in its shoe and/or flip sideways. When this happens, the roller bearing stops rolling and turns to sliding wear which grinds aggressively against the oval-shaped spinning cam shaft.

6. The fragile design of the CP4, and its mis-match for use with U.S. diesel, was never remedied. A reasonable manufacturer would have chosen a more robust pump design, an oil-lubricated pump, or a lubrication monitoring and dosing system. Instead, Ford increased the filtering and water separation in the low-pressure fuel system, but these "Band-Aid" countermeasures are also easily overwhelmed or circumvented by normal variations in U.S. diesel fuel quality, resulting in the same failure of the CP4 that they were purported to prevent.

7. While wear particles are harmful and damaging to the entire high-pressure fuel system and engine, they are not readily apparent. Metal fragments do considerable permanent and expensive damage to the engine, reducing engine efficiency, performance, and mileage, and ultimately resulting in catastrophic

failure. Because the CP4 has two pumping elements (CP4.2), one may compensate for or conceal the growing failure in the other.

8.  Ford has further sought to delay vehicle owners' discovery of the damage through re-defining "failure" and delaying repairs, in the hopes that the final and catastrophic failure occurs outside of the vehicles' warranty period. Ford's efforts to conceal the problem include, but are not limited to, software updates to raise the threshold of reporting inefficiencies caused by pump damage; instructing its dealerships not to look in places where metal fragments are most likely to be found; and/or refusing to accept the presence of metal shavings as proof of catastrophic failure. Ford's software update has further served to erase the water-in-fuel (WIF) sensor history, thereby denying the vehicle owner of his or her defense and record that the vehicle was properly maintained.

9.  Ford continues to profit from the sale of these expensive and unreasonably fragile diesel trucks. While Ford advertised these vehicles as appropriate for use in the United States, they are simply not durable when used with real world U.S. diesel. Despite knowing better, Ford continues to pass the buck and blame consumers for a problem that is the result of Ford's bad design and failure to properly design, validate, and test these vehicles.

10. Ford's motive for this deception is that it saw Bosch's CP4 fuel pump as a cost-saving measure: it uses less fuel by exerting higher fuel pressures, and is

cheaper to manufacture than its predecessor, the CP3. The CP4 fuel pump gave Ford a way to profit by advertising the trucks' superior fuel efficiency, while also being able to tout the reliability and durability that diesel vehicles are known for. After the CP4 fuel injection system worked marginally successfully in vehicles in Europe, Ford sought to use the CP4 pump in American vehicles, promising consumers exactly what they were looking for—improvements in torque, horsepower, durability, and fuel economy. But Ford could never deliver on that promise for American vehicles because the CP4 fuel pump is not compatible with American diesel fuel; in fact, the improved fuel efficiency that comes with the CP4 pump *also* comes at the cost that it destroys itself, and—ultimately—destroys the fuel injection system and engine altogether. This "catastrophic" (i.e., complete and total) pump failure can occur as early as "mile 0," since the fuel injection disintegration process begins at the very first fill of the tank, and starts damaging the vehicle's fuel injection system and engine immediately upon the vehicle's first use.

11.    U.S. diesel is cleaner than European diesel, which means that it also provides less lubrication than European diesel. When U.S. diesel is run through the fast-moving, high-pressure, lower-volume CP4 pump, it struggles to maintain lubrication. The cleaner, thinner diesel allows air pockets to form inside the pump during operation, causing metal to rub against metal, generating metal shavings which are dispersed throughout the fuel injection system, contaminating and

destroying the fuel system and indeed the entire engine. Such catastrophic failure often causes the vehicle to shut-off while in motion and renders it unable to be restarted, because the vehicle's fuel injection system and engine component parts have been completely contaminated and destroyed. The sudden and unexpected shut-off of the vehicle's engine while it is in motion and subsequent inability to restart the vehicle present an inherent risk to consumer safety—one which Ford has recognized in the past—and one which Plaintiffs were not aware of prior to purchasing the Class Vehicles. Thus, contrary to Ford's claims that the CP4 fuel injection system renders the Class Vehicles more reliable, more powerful, and more fuel-efficient, the CP4 fuel injection system actually renders them unreasonably costly, destructive, and dangerous.

12.     Moreover, when catastrophic CP4 fuel pump failure occurs, it results in an outrageously expensive repair bill, ranging from $8,000-$20,000, all for a repair that will not truly ameliorate the issue so long as the vehicle is being filled with U.S. diesel.

13.     Compound this with the fact that the Class Vehicles come with a hefty price tag to begin with, as prices can reach as high as $90,000+ if purchased brand new and upwards of $80,000 if purchased used. Diesel fans pay so much more for their trucks because diesel trucks are expected to last for 500,000 to 800,000 miles, and have more power *and* a lower fuel bill than their gasoline counterparts.

14.     From the outset, Ford knew that the fundamental design of the pump was incompatible with the specifications of U.S. diesel. This is evidenced by the fact that Ford had experience with widespread catastrophic fuel injection pump failures when cleaner diesel standards were first implemented in the 1990s.  By 2002, the Truck & Engine Manufacturers Association ("EMA")—of which Ford is a member company[2]—acknowledged that the lower lubricity of American diesel could cause catastrophic failure in high-pressure fuel injection system components that are made to European diesel specifications.  Not only did Ford fail to inform American consumers and fail to stop touting the fabricated benefits of the vehicles containing CP4 pumps, they actively attempted to shift the blame to the American consumers. For instance, in 2010, Ford began claiming it was *consumers'* improper use of contaminated or substandard fuels that damaged the vehicles' fuel system, even when Ford knew that the malfunction was *actually* the result of the CP4 fuel injection pump design, which was simply not fit for American diesel fuel. Ford methodically informed its dealers about how to identify these failures in the 6.7L Power Stroke engine, and further instructed its authorized repairpersons as to the most effective ways of avoiding good-faith claims for warranty coverage, in response to (and anticipation of) its escalating rate of Bosch-supplied fuel pump

---

[2]*See* Truck & Engine Manufacturers Association (EMA) Membership webpage, http://www.truckandenginemanufacturers.org/companies/ (last accessed Aug. 5, 2019).

failures in the U.S.[3] As a result, many consumers harmed by Ford's conduct have spent several hundred or several thousand dollars attempting to prevent or mitigate these failures by installing a lift pump or purchasing fuel additives to enhance the fuel lubrication in the vehicle.

15. Put simply, Plaintiffs and all Members of the proposed Classes paid a premium for their diesel vehicles, and were harmed by being sold vehicles with a defective fuel injection pump that is substandard for American fuel. They have suffered the consequences of an innately manifested—though not readily apparent—defect that secretly existed in the Class Vehicles at the time of sale (or lease), and which began damaging the Class Vehicles and their fuel delivery systems upon first use. Plaintiffs and members of the proposed Classes were thus injured at the point of sale and throughout their ownership of the vehicles, and paid far more than they would have if Ford had disclosed the defect prior to the underlying transactions.

---

[3] *See, e.g.*, Ford Warranty Action Notice No.10-2011, "6.7L Powerstroke Diesel Engine Fuel Contamination, 2011 F-Super Duty, Article 10-B-2011," submitted in response to NHTSA Inquiry No. EA11-003, available at https://static.nhtsa.gov/odi/inv/2011/INRD-EA11003-50103P.pdf (last accessed Aug. 7, 2019), at 74 (Ford notifying its dealerships that "[a] review of warranty claims and returned parts has found that some dealers have replaced 6.7L Powerstroke Diesel Engine fuel system components (including the High Pressure fuel injection pump and injectors) due to damage caused by contaminated fuel," and instructing them, "**Don't** [r]eplace fuel system components under warranty for damage caused by fuel contamination").

## II.    PARTIES

### A.    The Plaintiffs

16.    For ease of reference, the following chart identifies the Representative Plaintiffs and their vehicles:

| Representative Plaintiff | Make | Model | Year |
|---|---|---|---|
| Mark William Droesser | Ford | F350 | 2015 |
| Jeffery A. Ford, Sr. | Ford | F250 | 2014 |
| Jeffery Fowlkes | Ford | F250 | 2014 |
| Matthew Parker | Ford | F250 | 2012 |
| Trevor Wentz | Ford | F350 | 2017 |

**Plaintiff Mark William Droesser**

17.    Plaintiff Mark William Droesser (for the purpose of this paragraph and the immediately following paragraph, "Plaintiff") is a citizen of the State of Louisiana, and domiciled in Eros, Louisiana. On or around May 1, 2014, Plaintiff purchased a new 2015 Ford F350, VIN 1FT8W3DT1FEA81237 (for the purpose of this paragraph and the immediately following paragraph, the "Class Vehicle") for approximately $58,000 from Steven Ford of Augusta, an authorized Ford dealership in Augusta, Kansas. Plaintiff still owns the Class Vehicle and it has approximately 115,906 miles on it. Plaintiff uses his F350 as his daily vehicle to get to and from work and for daily activities.

18.    In the days and weeks preceding Plaintiff's purchase, Plaintiff saw Ford's television commercials, internet advertisements, sales brochures, and heard

statements from dealer sales representatives wherein Ford claimed the diesel truck, like the one Plaintiff would purchase, had superior horsepower, fuel economy, reliability, and durability compared to other trucks in the American market, and most importantly, that it was compatible for use with U.S. diesel.  On the date that Plaintiff purchased the vehicle, and in purchasing the vehicle, Plaintiff relied on representations from Ford and its dealership sales representatives that the vehicle was compatible with U.S. diesel fuel, was durable, and was reliable.  Absent these representations, Plaintiff would not have purchased the vehicle because it is unfit for its ordinary use and purpose.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 high-pressure fuel injection pump that was not suitable for American vehicles and which deceived American consumers.  Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon.  Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the Ford Power Stroke diesel engine's CP4 high-pressure fuel injection pump—which is common to all Class Vehicles—prior to purchasing.  Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of Ford's wrongful, deceptive conduct.  As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not

limited to, paying a high premium for the engine compared to what they would have paid for a gas-powered engine or other non-defective diesel truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. There is a substantial difference in the market value of the vehicle promised by Ford and the market value of the vehicle received by Plaintiffs. Plaintiffs did not receive the benefit of the bargain, but received less than what was bargained for. Plaintiff thusly brings claims individually and as a representative of the Class.

**Plaintiff Jeffrey A. Ford, Sr.**

19.    Plaintiff Jeffrey A. Ford, Sr. (for the purpose of this paragraph and the immediately following paragraph, "Plaintiff") is a citizen of the State of Louisiana, and is domiciled in Natchitoches, Louisiana. On or around September 1, 2017, Plaintiff purchased a certified pre-owned 2014 Ford F250, VIN 1FT7W2BT8EEA21091 (for the purpose of this paragraph and the immediately following paragraph, "Class Vehicle") for approximately $43,700 from A&G Auto Sales, an authorized dealership in Shreveport, Louisiana. At the time of purchase the Class Vehicle had 76,395 miles on it. Plaintiff still owns the Class Vehicle and it has approximately 91,757 miles on the odometer. Plaintiff uses his F250 as his daily driving vehicle for daily activities. In or around May 23, 2019, Plaintiff was driving the Class Vehicle on Interstate 20 from Big Spring to his home when the truck shut

down on the highway. A message alert came on that read "reduced engine power," the Class Vehicle stalled, and then fully died and would not restart. The Class Vehicle was towed by co-workers to Plaintiff's job site and then towed to a certified Ford mechanic at Power Source Diesel in Coahoma, Texas. At the time of the catastrophic failure, Plaintiff's Class Vehicle was still under a Ford-backed 5-year/100,000-mile manufacturing warranty. Ford informed Plaintiff that the CP4 pump was not covered under warranty and refused to cover the repairs despite the fact the truck had only approximately 91,632 miles on it. Plaintiff filed a claim with his insurance company and it was denied due to a faulty part. Plaintiff was forced to pay approximately $8,800 in out-of-pocket repair costs.

20.     In the days and weeks preceding Plaintiff's purchase, Plaintiff saw Ford's television commercials, internet advertisements, and sales brochures wherein Ford claimed the diesel truck, like the one Plaintiff would purchase, had superior horsepower, fuel economy, reliability, and durability compared to other trucks in the American market, and most importantly, that it was compatible with U.S. diesel. On the date that Plaintiff purchased the vehicle, and in purchasing the vehicle, Plaintiff relied on representations from Ford that the vehicle was compatible with American diesel fuel, was durable, and was reliable. Absent these representations, Plaintiff would not have purchased the vehicle because it is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle

contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the Ford Power Stroke diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of Ford's wrongful, deceptive conduct. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, paying a high premium for the engine compared to what they would have paid for a gas-powered engine or other non-defective diesel truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. There is a substantial difference in the market value of the vehicle promised by Ford and the market value of the vehicle received by Plaintiffs. Plaintiffs did not receive the benefit of the bargain, but received less than what was bargained for. Plaintiff thus brings claims individually and as a representative of the Class.

**Plaintiff Jeffery K. Fowlkes**

21.     Plaintiff Jeffery K. Fowlkes (for the purpose of this paragraph and the immediately following paragraph, "Plaintiff") is a citizen of the State of Michigan, and domiciled in Farmington Hills, Michigan. On or around May 5, 2018, Plaintiff purchased a 2014 Ford F250, VIN 1FT7W2BT6EEB10805 (for the purpose of this paragraph and the immediately following paragraph, the "Class Vehicle") for approximately $45,000 from Bob Maxey Ford of Detroit, an authorized Ford dealership in Detroit, Michigan. At the time of purchase the Class Vehicle had approximately 80,000 miles on it.  Plaintiff still owns the Class Vehicle and it has approximately 100,000 miles on it. Plaintiff uses his F250 as his daily vehicle to get to and from work and for daily activities.

22.     In the days and weeks preceding Plaintiff's purchase, Plaintiff saw Ford's television commercials, internet advertisements, sales brochures, and heard statements from dealer sales representatives wherein Ford claimed the diesel truck, like the one Plaintiff would purchase, had superior horsepower, fuel economy, reliability, and durability compared to other trucks in the American market.  On the date that Plaintiff purchased the vehicle, and in purchasing the vehicle, Plaintiff relied on representations from Ford and its dealership sales representatives that the vehicle was compatible with American diesel fuel, was durable, and was reliable. Absent these representations, Plaintiff would not have purchased the vehicle because

it is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the Ford Power Stroke diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of Ford's wrongful, deceptive conduct. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, paying a high premium for the engine compared to what they would have paid for a gas-powered engine or other non-defective diesel truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. There is a substantial difference in the market value of the vehicle promised by Ford and the market value of the vehicle received by Plaintiffs. Plaintiffs did not receive the benefit of the bargain, but received less than what was bargained for. Plaintiff thusly brings claims individually and as a representative of the Class.

**Plaintiff Matthew Parker**

23.     Plaintiff Matthew Parker (for the purpose of this paragraph and the immediately following paragraph, "Plaintiff") is a citizen of the State of Ohio, and is domiciled in Lima, Ohio. On or around May 1, 2015, Plaintiff purchased a 2012 Ford F250, VIN 1FT7W2BT6CEA68021 (for the purpose of this paragraph and the immediately following paragraph, "Class Vehicle") for approximately $40,000 from Terry Hendricks Ford, an authorized Ford dealership in Archbold, Ohio. At the time of purchase the Class Vehicle had approximately 24,000 miles on it. Plaintiff still owns the Class Vehicle and it has approximately 70,000 miles on the odometer. Plaintiff uses his F250 as his daily vehicle for daily activities. In or around May 2018, Plaintiff was driving the Class Vehicle a few miles from his home on Interstate 75. He noticed the Class Vehicle had black smoke coming from the exhaust and soon thereafter the Class Vehicle shut down and would not restart. At the time of the catastrophic failure Plaintiff's Class Vehicle was still under a Ford-backed 5-year/100,000-mile manufacturing warranty. The Class Vehicle was taken to Popiel Diesel Performance, LLC in Harrod, Ohio, for repair. There were metal shavings found in the fuel. Ford refused to cover this repair under warranty despite the fact the truck had only approximately 65,000 miles on it. Plaintiff's insurance company contacted the gas station to investigate if there was fuel contamination. The

insurance company concluded it was not fuel contamination. Plaintiff was forced to pay approximately $8,000 in out-of-pocket repair costs.

24.     In the days and weeks preceding Plaintiff's purchase, Plaintiff saw Ford's television commercials, internet advertisements, sales brochures, and heard statements from dealer sales representatives wherein Ford claimed the diesel truck, like the one Plaintiff would purchase, had superior horsepower, fuel economy, reliability, and durability compared to other trucks in the American market, and most importantly, that it was compatible with U.S. diesel.  On the date that Plaintiff purchased the vehicle, and in purchasing the vehicle, Plaintiff relied on representations from Ford and its dealership sales representatives that the vehicle was compatible with American diesel fuel, was durable, and was reliable.  Absent these representations, Plaintiff would not have purchased the vehicle because it is unfit for its ordinary use and purpose.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the Ford Power Stroke diesel engine's CP4 high pressure fuel pump

system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of Ford's wrongful, deceptive conduct. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, paying a high premium for the engine compared to what they would have paid for a gas-powered engine or other non-defective diesel truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. There is a substantial difference in the market value of the vehicle promised by Ford and the market value of the vehicle received by Plaintiffs. Plaintiffs did not receive the benefit of the bargain, but received less than what was bargained for. Plaintiff thus brings claims individually and as a representative of the Class.

**Plaintiff Trevor Wentz**

25. Plaintiff Trevor Wentz (for the purpose of this paragraph and the immediately following paragraph, "Plaintiff") is a citizen of the State of Pennsylvania, and is domiciled in Haven, Pennsylvania. On or around May 25, 2018, Plaintiff purchased a 2017 Ford F350, VIN 1FT8W3BT2HEB72314 (for the purpose of this paragraph and the immediately following paragraph, "Class Vehicle") for approximately $70,000 from Mark Martin Motors, a dealership in Mannheim, Pennsylvania. At the time of purchase the Class Vehicle had 24,000 miles on it.

Plaintiff still owns the Class Vehicle and it has approximately 34,912 miles on the odometer. Plaintiff uses his F350 as his daily vehicle for daily activities and occasionally pulls a 36.5-foot fifth-wheeler trailer. In or around May 2019, Plaintiff was driving the Class Vehicle in a residential area in Pennsylvania when Class Vehicle shut down due to fuel pump failure and would not restart. At the time of the catastrophic failure Plaintiff's Class Vehicle was still under the Ford-backed 5-year/100,000-mile manufacturing warranty. The Class Vehicle was taken to a Ford dealership in Hamburg, Pennsylvania. Ford refused to cover the repair under warranty despite the fact the truck had only approximately 34,912 miles on it. Plaintiff had the repairs done by a personal mechanic with out-of-pocket costs of approximately $7,000.

26.     In the days and weeks preceding Plaintiff's purchase, Plaintiff saw Ford's television commercials, internet advertisements, and sales brochures wherein Ford claimed the diesel truck, like the one Plaintiff would purchase, had superior horsepower, fuel economy, reliability, and durability compared to other trucks in the American market, and most importantly, that it was compatible with U.S. diesel.  On the date that Plaintiff purchased the vehicle, and in purchasing the vehicle, Plaintiff relied on representations from Ford that the vehicle was compatible with American diesel fuel, was durable, and was reliable.  Absent these representations, Plaintiff would not have purchased the vehicle because it is unfit for its ordinary use and

purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the Ford Power Stroke diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of Ford's wrongful, deceptive conduct. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, paying a high premium for the engine compared to what they would have paid for a gas-powered engine or other non-defective diesel truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. There is a substantial difference in the market value of the vehicle promised by Ford and the market value of the vehicle received by Plaintiffs. Plaintiffs did not receive the benefit of the bargain, but received less than what was bargained for. Plaintiff thus brings claims individually and as a representative of the Class.

**B.     The Defendant**

27.     Defendant Ford Motor Company ("Ford") is a publicly traded corporation organized under the laws of the State of Delaware with its principal place of business at One American Road, Dearborn, Michigan 48126.  Defendant Ford Motor Company can be served with process through its agent The Corporation Company, 40600 Ann Arbor Road E. Ste. 201, Plymouth, Michigan, 48170.

28.     Defendant Ford designs, manufactures, distributes, and sells Ford automobiles in this District and multiple other locations in the United States and worldwide.  Ford and/or its agents designed, manufactured, and installed the engine systems in the Class Vehicles.  Ford also developed and disseminated the materially misrepresentative owner's manuals and warranty booklets, advertisements, and other intentionally unreasonable and deceptive promotional materials relating to the Class Vehicles.   Ford also designed advertising material that it sent to Ford Dealerships for the purpose of having dealers distribute these to consumers, and Ford authorized dealers to communicate with consumers about the performance of the vehicles.

### III.    VENUE AND JURISDICTION

29.     Venue is proper in this District under 28 U.S.C. § 1391 in light of the following: (1) Defendant Ford Motor Company's principal place of business is in this District and thus it conducts substantial business in this District and has

intentionally availed itself of the laws and markets of the United States and this District; and (2) Many of the acts and transactions giving rise to this action occurred in this District, including, *inter alia,* Ford's promotion, marketing, distribution, and sale of vehicles containing the defective Bosch CP4 fuel pump in this District. At least one named Plaintiff, as well as thousands of Class Members, purchased their Class Vehicles from one of the multiple Ford dealerships located in this District. Further, a significant number of the Class Vehicles were registered in this District and thousands of Class Vehicles were in operation in this District. Venue is also proper under 18 U.S.C. § 1965(a) because Ford is subject to personal jurisdiction in this District as alleged, *infra*, and Ford has agents, *i.e.,* Ford-certified dealerships, located in this District.

30.     The Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class Member is of diverse citizenship from one Defendant, there are more than 100 Class Members, and the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs. Subject-matter jurisdiction also arises under the Magnuson-Moss Warranty Act claims asserted under 15 U.S.C. § 2301, *et seq.*

31.     This Court has personal jurisdiction over Defendant Ford Motor Company pursuant to 18 U.S.C. §§ 1965(b) and (d), and as well as supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. Ford has

committed and continues to commit acts giving rise to this action within Michigan and within this judicial District. Ford has established minimum contacts within the forum such that the exercise of jurisdiction over Ford would not offend traditional notions of fair play and substantial justice. In conducting business, *i.e.,* marketing, supplying, and distributing Ford-brand automobiles within the State of Michigan, and specifically, within this judicial District, Ford derives substantial revenue from its activities and its products being sold, used, imported, and/or offered for sale in Michigan and this judicial District. Ford has multiple Ford-brand dealerships in the State of Michigan and sells thousands of automobiles each year in the state. Ford provides advertising and customer facing information to theses dealers for the purpose of exposing consumers across the country to that information.

## IV. FACTUAL ALLEGATIONS

### A. The Class Vehicles

32. For purposes of this Complaint, the "Class Vehicles" consist of Ford-manufactured diesel-fueled automobiles equipped with a 6.7L Power Stroke engine, ranging from the 2011–present model years. All vehicles falling under this Class Vehicle group were manufactured with the defective CP4 fuel injection pump.

### B. The Rise of Diesel Vehicles in the United States

33. Diesel engines have long enjoyed a loyal following in some U.S. market segments because of their reliability, fuel efficiency, and power. Diesel engines produce higher torque, even at low revolutions per minute ("RPM"), making them

popular in buses, heavy-duty pickups, and vans, including commercial vehicles, farm trucks, and ambulances.

34.     With the invention of common-rail systems, diesel fuel was injected at higher pressure, forming a finer mist that increases fuel efficiency and power. Common-rail systems also made diesel engines burn cleaner and with less noise. While diesel had long been popular overseas, these advances fueled a growing market here in the U.S. for diesel trucks, and even diesel passenger cars.

35.     From the outset, Ford was in competition with fellow Members of the "Big Three"—i.e., auto giants General Motors ("GM") and Fiat Chrysler ("FCA"), with each racing to dominate the American diesel vehicle market.[4]  Ford looked to Europe and the expertise of international automotive parts supplier Bosch to increase the fuel efficiency and power of its diesel engines.  The heart of this diesel revolution would be powered by Bosch's more durable CP3 fuel injection pump, the predecessor to the CP4 fuel injection pump at issue in this suit.  The reliability of the CP3 became key to the "million-mile" reputation of diesel truck engines in the U.S. Not surprisingly, American trust in diesel technology grew.

---

[4] Notably, both GM and FCA eventually incorporated the CP4 into their respective diesel-engine vehicle platforms with similarly catastrophic results – of which Ford was contemporaneously aware. *See, e.g.*, FORD_DIESEL_00005019, Oct. 21-25, 2011 email chain between Ford employees K. Pumford, B. Fulton, and C. Arnesto, at -5019 (Pumford writing,

36.     American consumers paid a "Built Ford Tough" premium for the increased reliability, fuel efficiency, and power of diesel—and, Bosch promised to continue to deliver advances and continued improvements.  Bosch claimed that the next generation of fuel pump, the CP4, would maintain reliability while also increasing fuel efficiency and power, but expressly ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████[5]

As discussed further below, this is something Ford did not sufficiently do.

37.     Much like what occurred in the nationwide Volkswagen emissions scandal involving Bosch, reliance on Bosch's expertise in the design of diesel engines would lead Ford into a course of action it should now regret.  The heart of Ford's success under increasingly competitive fuel efficiencies was Bosch's cheaper, substandard CP4 fuel injection pump.  Bosch had the technical know-how to do what needed to be done to get ahead; unfortunately for the American public, the easiest way for Ford to succeed was to cheat American consumers on durability and overall vehicle functionality by equipping the Class Vehicles with this ticking time bomb of a fuel injection pump that dooms the modern Ford Power Stroke diesel engine system from day one.

---

[5] FORD_DIESEL_00008469, Feb. 27, 2008 Bosch CP4 Common-Rail High-Pressure Pump Characteristic Data Sheet, at -8477.

C.     **Ford's Knowledge of Incompatibility, Defectiveness, and Failures Associated with Bosch's CP4 Pump When Used with American Diesel Fuel**

38.     The CP4 Pump operates at higher pressures than its predecessor, the CP3. The CP4 achieves greater fuel efficiency by pumping less fuel through the engine; however, it is incompatible with U.S. diesel fuel.

39.     The CP4 relies on the diesel fuel itself to maintain lubrication. The lubricity of diesel in Europe is more standardized than American diesel, but European diesel is also dirtier. Because the sulfur in diesel exhaust is a major cause of smog and acid rain, in 2007, the EPA required diesel fuel sold in the U.S. to have less than 15 ppm of sulfur. This is known as Ultra Low Sulfur Diesel ("ULSD"). It is produced through a refinery process known as hydrodesulfurization ("HDS"). Sulfur provides some of the lubricity needed for the pump to operate. But more importantly, the refinery process required to produce low sulfur diesel destroys a variety of important nitrogen and oxygen based polar and organic compounds that give diesel fuel its lubricity. Indeed, ULSD fuel is considered to be very 'dry' and incapable of lubricating vital diesel fuel delivery components, specifically high-pressure fuel pumps and injectors; as a result, American diesel does not contain the lubrication necessary for the Bosch CP4 Pump to operate durably, and these fuel injection system components "are at risk of premature and even catastrophic failure

when ULSD fuel is introduced to the system."[6]  Low sulfur diesel fuel first appeared in American markets in the 1990s, with fewer than 500 ppm of sulfur.  It is estimated that 65 million fuel injection pumps failed as a result.  It was thought that the pumps failed at the equivalent of 100 to 200 hours of operation.  Thus, the critical importance of lubricity for diesel injection pumps was well known to all auto manufacturers for a decade or more before the Class Vehicles were designed or introduced into the market.

40.    Moreover, Ford was well aware of the foreseeable mismatch of the lower lubricity specifications of ULSD and the Bosch CP4 fuel pump:

> Lubricity describes the ability of a fluid to minimize friction between, and damage to, surfaces relative to motion under loaded conditions.  Diesel fuel injection equipment relies on the lubricating properties of fuel.  Shortened life of engine components such as fuel injection pumps and unit injectors can usually be attributed to lack of fuel lubricity and, hence, lubricity is of concern to engine manufacturers.  This property is not addressed adequately by ASTM D 975.

Apr. 22, 2002, Truck & Engine Manufacturers' Association ("EMA"), Position Statement entitled, "EMA Consensus Position Pump Grade Specification."

41.    Ford Motor Company is a member of the EMA.[7]

42.    Further, the EMA made clear:

---

[6] Arlen Spicer, *Diesel Fuel Lubricity Additives: Study Results*, THE DIESEL PLACE, Aug. 26, 2007, available at http://www.jatonkam35s.com/DeuceTechnicalManuals/ Diesel_fuel_additive_test.pdf (last accessed Aug. 5, 2019).

[7] *See* Truck & Engine Manufacturers Association (EMA) Membership webpage, *supra* note 2.

Regardless of the fuel sulfur level, ASTM D975 currently requires lubricity specified as a maximum wear scar diameter of 520 micrometers using the HFRR test method (ASTM D6079) at a temperature of 60°C. Based on testing conducted on ULSD fuels, however, fuel injection equipment manufacturers have required that ULSD fuels have a maximum wear scar diameter of 460 micrometers. EMA recommends that the lubricity specification be consistent with the fuel injection equipment manufacturers' recommendation.

8/8/2005 Engine Manufacturers Association, Position Paper entitled "North American Ultra Low Sulfur Diesel Fuel Properties."

43.     In 2005, the EPA instituted a lubricity requirement for the lower sulfur diesel sold in the U.S.  It required sellers of diesel to ensure the fuel initially meets a minimum lubricity level of a maximum wear scar diameter of 520 microns based on the testing and standard propounded by the American Society for Testing and Materials ("ASTM") D-975.

44.     By 2007, on-road diesel fuel in the U.S. for highway vehicles was uniformly ULSD, which has an allowable sulfur content much lower (15 ppm) than the previous U.S. on-highway standard for low sulfur diesel (500 ppm)."[8] In reality,

---

[8] *See New Ultra Low Sulfur Diesel fuel and new engines and vehicles with advanced emissions control systems offer significant air quality improvement*, Clean Diesel Fuel Alliance, Feb. 25, 2017, available at https://web.archive.org/web/20170225141751/http://www.ct.gov/deep/lib/deep/air/ultra_low_sulfur_diesel/ulsdfs.pdf (last accessed Aug. 7, 2019); *see also* J. Thijssen, LLC, *The Impact of Future Diesel Fuel Specifications and Engine Emissions Standards on SOFC*, U.S. DEPT. OF ENERGY, NAT'L ENERGY TECHNOLOGY LABORATORY, June 29, 2004, at I.

2007-and-later U.S. diesel frequently contains even less than 15 ppm, a truth that is widely known within the U.S. automotive industry and was indeed known by Ford early-on.[9]

45.     In 2008, Bosch published and presented a paper to a global audience of auto aficionados at SAE International. Bosch's study was entitled, "Investigation into the Formation and Prevention of Internal Diesel Injector Deposits," which explained in near-granular detail the purported compatibility-related fueling issues present in various diesel fuel markets, and how to prospectively avoid them. This paper, which was circulated among decision-makers at Ford and Bosch,[10] became publicly available as part of a larger NHTSA investigation, as referenced and further explained below.

---

[9] *See, e.g.,* FORD_DIESEL_00004956, Oct. 27, 2011 email chain between Ford employees K. Pumford, P. Bruckner, B. Fulton *et al.* beginning with Bruckner's question to Pumford, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ umford responds, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See also 2014 Infineum Worldwide Winter Diesel Fuel Quality Survey*, INFINEUM INT'L LTD., available at https://www.infineum.com/media/80722/wdfs-2014-full-screen.pdf (last accessed Aug. 5, 2019), at 6-7 (Infineum Worldwide Winter Diesel Fuel Quality Survey in which 341 diesel fuel samples were tested from around the world and **all** diesel fuel samples that the organization collected and tested from the U.S. and Canada contained 10 ppm S or less).

[10] *See* Dec. 16, 2009, email from E. Santiago to Ford employees S. Eeley and D. Mondragon forwarding *Investigation into the Formation and Prevention of Internal Diesel Injector Deposits*, SAE TECHNICAL PAPER SERIES (2008-01-0926), available at https://static.nhtsa.gov/odi/inv/2011/INRD-EA11003-50107P.pdf (last accessed Aug. 7, 2019), at 150-62.

46.    Moreover, in September 2009, the Joint Diesel Fuel Injection Equipment Manufacturers ("Joint FIE Manufacturers") released a "Common Position Statement regarding Fuel Requirements for Diesel Fuel Injection Systems," in which the Joint FIE Manufacturers expressed the following key points to their U.S. automotive industry customers:

> The continuous world-wide tendency to increase engine performance and reduce emissions has necessitated the development of new generations of enhanced diesel fuel injection equipment, supporting the achievement of stringent legislation targets.  Rising injection pressures and multiple injections result in higher operating temperatures, increased contract pressures and reduced clearances . . . .  Alterations to fuel quality, e.g., by increasingly severe refinery hydroprocessing being introduced to remove Sulphur also reduce the content of aromatics and destroy surface active compounds and antioxidants. ***Removal of these beneficial compounds effects boundary lubrication, commonly known as lubricity, and inherent oxidation stability and must be compensated for.*** Fuel parameters such as cetane number, viscosity, density, lubricity, oxidation stability, sulfur and aroma content, together with the absence of free water and dirt contamination, are key parameters required to ensure performance of equipment in the field.
>
> Biofuels are becoming increasingly available to end-users [including] in the United States of America . . . .  It must be recognized that the physical and chemical characteristics of bio components are significantly different to conventional fuels and that care must be taken in their specification and use.
>
> Diesel fuel injection equipment (FIE) manufacturers fully support the development of alternative sources of fuel . . . . ***However, many vehicles, engines and equipment are not***

> *designed to run on them. It is recommended to refer to the vehicle and engine manufacturers 'Limitations of Use' documents for guidance.*"[11]

47.     A prudent manufacturer would design or select a fuel injection pump designed for the fuel of the country in which the vehicle is to be sold.

48.     Yet Ford solicited Bosch to provide the CP4 Pump for Ford's Power Stroke engines beginning with the 2011 model year. It was no secret to them that the CP4 Pump is inappropriate for diesel vehicles in the U.S. The CP4 Pump was originally designed for European fuel's greater lubricity standard of 460 wear scar. Ford never performed testing necessary to certify the vehicles containing CP4 pumps for use with American diesel (including Biodiesel). Ford purposefully failed to test the vehicles with fuels that accurately represent the ASTM D-975 specification of U.S. diesel with regard to lubricity and water content.[12] And Ford completely failed to test and design in accordance with the variability in fuel quality found in the real world at the pump.

---

[11] Joint FIE Manufacturers, *Fuel Requirements for Diesel Fuel Injection Systems: Diesel Fuel Injection Equipment Manufacturers: Common Position Statement 2009*, Sept. 2009, available at http://www.globaldenso.com/en/topics/files/common_position_paper.pdf (last visited Aug. 5, 2019) (emphasis added).

[12] *See, e.g.*, FORD_DIESEL_00005320, at 5321 (May 4, 2006 Ford Engineering Material Specification ("EMS") for general purpose Ultra-Low Sulfur Diesel ("ULSD") to be used in Ford vehicle testing, which ███████████████████████████████████████████████████ ██ ████ ██████      ████████      ████████      ████████      ██████ FORD_DIESEL_00049779 (May 17, 2012 EMS for general purpose ULSD stating same).

49.     In order to reduce costs and increase fuel efficiency, Ford sold vehicles with a fuel injection pump that was clearly out of specification, having inadequate lubrication, corrosion resistance, and durability for the U.S. market.  Ford continues to feign ignorance while blaming consumers for the mismatch between its trucks and the fuel available at the pump.[13]

50.     The adverse effects of ULSD on high-pressure fuel pump injection systems have been acknowledged within the automotive industry. For example, in a July 2014 study on the use of fuel injection equipment with global diesel fuels, Parker Racor, the leading global supplier of diesel fuel filtration systems, explained the following:

> The increase in system pressures in diesel engines has a significant effect on filtration requirements. These systems are highly vulnerable to many forms of contaminants and the need for robust high efficiency filtration has never been higher . . . . An analysis of global diesel fuel quality shows that although the fuel quality in the developed markets has improved, significant quality concerns still remain. Levels of water and contaminants remain at levels that can cause long term issues to the latest fuel injection systems. Specifically, the levels of contaminants smaller than 5 microns remain very high. These particles can be small enough to pass into the internal clearances of high pressure fuel injection systems

---

[13] Moreover, for a consumer, there *is* no "good versus bad" fuel retailer analysis – the consumer cannot "choose" the quality of the diesel fuel s/he purchases from Exxon, Chevron, Texaco, Valero, or any other diesel fuel retailer.  It is absurd to think that a consumer should have to perform scientific testing on the diesel fuel s/he acquires at his/her local gas station prior to putting said diesel into the Class Vehicles.  The bottom line is that fuel quality is not a customer choice.

and can lead to erosion and wear of critical areas leading to a loss in system performance and eventually system malfunction. Diesel filtration balances pressure drop, useful life and efficiency. ***However the real long term effect on fuel system life is often not adequately considered[,] as much of the engine durability testing performed is done using high quality fuel that doesn't represent the range of fuels seen in the market.*** Consideration of filtration performance under less than ideal conditions is necessary to develop an acceptable level of protection.[14]

51.     Indeed, the automotive industry was well aware of the consequences of this early-on. For example, in May 2010, after analyzing foreign particles found in the fuel filter of a failed Audi diesel engine and determining that the biodiesel used in the subject engine was "insufficient[ly] cleans[ed]" resulting in deposit formation "which is not conducive to establishing the lubricating film in the [fuel pump] roller support," Bosch noted that, "When [diesel fuel] viscosity is too low, the lubricating film is not established properly and mixed friction and surface contact occurs =

_____

[14] Steven Hardison & Adam Pearce, *July 2014 Summary of Fuel Injection Equipment with Respect to Diesel Fuel Filtration*, PARKER RACOR & AVL, Jan. 7, 2015, available at https://www.parker.com/literature/Racor/RSL0194%20Rev%20-%20(TAP_AVL-Fuel-Study-Racor).pdf (last accessed Aug. 5, 2019), at *i*; *see also id.* at 13 ("Careful monitoring of fuel quality and filter performance is needed to protect sensitive diesel engine injection systems"); *id.* at 29 ("To avoid costly engine and fuel system components damages, advanced multi-stage filtration is recommended"); *id.* at 31 ("Modern high pressure diesel fuel injection systems contain very small internal clearances and are vulnerable to any build-up of deposits on these components . . . . This issue has become a significant concern in the industry").

bad."[15] Likewise, in its January 2012 submission to NHTSA in response to the agency's investigation into high-pressure fuel pump failures, Ford noted that, "Inadequate lubricity can result in increased tailpipe emissions, excessive pump wear and, in some cases, catastrophic failure."[16] The CP4 is, by its own design, is expected to fail quickly through ordinary use in the U.S., and Ford saw this problem year after year[17] and yet continued to manufacture its diesel Super Duty trucks with the inherently defective fuel pump.

52. The Bosch CP4 Pump multiplies the diesel fuel problem in ways that are catastrophic. Ford chose the Bosch CP4 Pump because it was supposed to

---

[15] Jul. 27, 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59345P.pdf," at 12–14 (May 26, 2010 email chain between Audi and Bosch representatives re: "Particle analyses, fuel filter").

[16] Jan. 20, 2012, Ford Response to NHTSA Inquiry EA11-003, Document titled, "INRD-EA11003-50102P.pdf," at 19, available at https://static.nhtsa.gov/odi/inv/2011/INRL-EA11003-50102P.pdf (last accessed Aug. 7, 2019).

[17] *See, e.g.*, FORD DIESEL 00015951, Mar. 10, 2016 Ford PowerPoint entitled ▮▮▮

▮▮▮ *id.* at -5958 ▮▮▮ FORD DIESEL 00016600, Nov. 4-17, 2017 email chain between Ford and Bosch employees, at -6600 ▮▮▮

FORD DIESEL_00016983, May 24, 2017 Ford PowerPoint entitled▮ ▮▮ at -6984 (discussing ▮▮▮ *id.* at at -6986 (under "Recommendations:" ▮▮▮

improve fuel efficiency by using less fuel. The Bosch CP4 Pump struggles to supply adequate fuel to the engine under the higher pressures and lower volume of fuel in newer engines, and it is overly susceptible to air pockets forming inside the pump during operation. These air bubbles allow metal to rub against metal. Ford had achieved greater fuel efficiency at the expense of often running the pump dry.

53. To reiterate, as the CP4 fuel pump wears, it sends component metal shaving and other debris throughout the fuel system. As the shavings disperse and contaminate the engine and the high-pressure fuel system, the fuse of the proverbial CP4 "time bomb" has been lit, and it is only a matter of time before the entire engine system fails. The failure of a CP4 pump requires repair or replacement of the entire high-pressure fuel system, including the pump, fuel injectors, fuel rails, and injection lines. Repair costs when a CP4 pump fails average between $8,000 and $20,000.

54. Ford knew that the Bosch CP4 fuel injection pump was defective and incompatible with U.S. diesel fuel from the get-go, even prior to its usage in the Class Vehicles. CP4 failures began running rampant in American Audi and Volkswagen vehicles at least as early as 2008.[18] These failures echo the very failures

---

[18] *See, e.g.*, July 7, 2008 email between Audi and Bosch representatives re: "Performance drop AU716 98017 with shavings in the HPP," discussing how "[s]omething is disintegrating" in the Audi 716 fuel pump and that "[w]e are a bit speechless" about "[t]he shavings, or whatever it is"), submitted as part of Bosch's May 2012 responses to NHTSA ODI Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59334P.pdf," at 6; *id.* at 27 (July 31, 2008 email from Audi representative re: "Fuel quality in [**REDACTED**]," stating that, "With our [Audi's] V6TDI with the high-pressure pump CP4.2 we have significantly higher failure rates in [**REDACTED**] (higher

that continue to occur in the Class Vehicles to this day, and from late 2011 through early 2012, documentation regarding these widespread CP4 failures was provided to the National Highway Traffic Safety Administration ("NHTSA") by Bosch, Audi, and Volkswagen, in connection with NHTSA's Office of Defect Investigations ("ODI") Inquiry No. INRD-EA11003, an investigation which NHTSA eventually pulled Ford into as well.[19]

55.    This documentation, known in the industry, demonstrates the nature of the CP4 defect that would ultimately come to exist in the Class Vehicles.  For example, in August 2009, Audi sent Bosch a failed CP4 fuel pump for analysis after "[t]he high pressure fuel pump failed catastrophically shedding metal shavings throughout the entire fuel system . . . .  This car will require a complete new fuel system from tank to injectors and everything in between. This will be a very lengthy repair (weeks) . . . [and w]e need to determine if component failure or bad fuel is to blame." March 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 35.

---

by a factor of approx. 30 than the average of all markets) . . . . Have you any information suggesting that such a thing could be possible with this country-specific diesel fuel?"); *id.* at 28–31 (Feb.– May 2011 email chain between Audi, Volkswagen and Bosch representatives re: "Status CP4 USA," in which the parties discuss the substantial increase in warranty claims with the implementation of the CP4 in vehicles in the U.S. market).

[19] *See, e.g., infra* ¶¶ 63-64, 66, 71, 72, 74-75, and corresponding footnotes (discussing Ford's responses to NHTSA's requests pursuant to ODI Inquiry No. INRD-EA11003).

Thereafter, on September 1, 2009, Bosch responded to Audi with the following flippant analysis note from their failed pump inspection: "Gentleman, [t]he pump mentioned below was analyzed. The result of the finding is sand-like particles in the fuel. *Defect caused by customer*." *Id.* at 38 (emphasis added).[20]

56. Likewise, in September 2009, Bosch, at the time supplying the defective CP4 fuel pump to Audi and Volkswagen, received a notice from Audi about a "3rd HPP failure" in the U.S., explaining, "I'm afraid there's bad news from the U.S.: After 2 failures in the field . . . the 3rd HPP failure has now occurred in the EC endurance run."[21] Photos attached to the email show the failed Bosch CP4 fuel

---

[20] *See also* March 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 21 (Mar. 31, 2008 email from Volkswagen to Bosch re: "Radio: Drivetrain damage failure US07 (Jetta)," in which the parties are discussing an HPFP failure in a 2007 Jetta and the Volkswagen representative frustratedly states, "Can you (panel of experts) explain to us how the failure mechanism was after this mileage? . . . . We will certainly not accept a failure because of fuel quality! . . . . We also see a big risk here for our BIN5 pump, which has to manage with the same fuel in USA"); May 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59334P.pdf," at 9–10 (July 4, 2008 email from Audi to Bosch re: "CP4 BIN5 3rd and 4th failure in USA," analyzing root cause of CP4 field failures and positing, "Why is it that EC pumps do not fail? Because of a different fuel?"); *id.* at 13–14 (July 11, 2008 email between Audi and Bosch representatives re: "W19 BIN5 pump failure" in which Audi writes, "For the zero error meeting in FeP on Tuesday we expect the information discussed at the error meeting on endurance testing of fuels with 'poor lubricity, containing water etc.' and all failures, drivetrain damage in all component, system and other endurance runs of Bosch and all customers"); July 27, 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59345P.pdf," at 7 (emphasis added) (June 30, 2009 email between Bosch and Audi representatives re: "ANS: HPP measures/ USE," in which the Audi representative writes, "I don't think you're reading my mails anymore! Please look at the failure curves specifically, then you'll see that *we only have a problem in certain markets[.] . . . Depending on how poor the fuel currently on the market is*"); *id.* ("I'd prefer to have a more robust pump").

[21] Sept. 2, 2009, email from Audi representative to Bosch representatives regarding "3rd HPP Failure USA," produced in response to NHTSA Inquiry EA11003EN-00639[0], available

pump, replete with metal shavings in the gasket (*see* photographic illustration hereafter):[22]

 

57.    By the end of 2011, catastrophic failures of the Bosch CP4 fuel pump in the U.S. were widespread.[23]

---

at https://static.nhtsa.gov/odi/inv/2011/INRD-EA11003-59428P.PDF (last accessed Aug. 5, 2019), at 146.

[22] *Id.* at 148–50.

[23] *See* July 27, 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59345P.pdf," at 69 (emphasis added) (Sept. 15, 2011 email from Volkswagen to Bosch re: "080211 Status CP4.1 Bosch," in which the Volkswagen representative sends a formal "change request in [the] form of exemplary documents on failures of high-pressure diesel pump Bosch CP4.1. *I think the failures are well known*. It is also important to know that not only the high-pressure fuel pump, but the entire injection system is to be replaced in case of damage to a HPP with a cost >[**REDACTED**] caused by chip contamination"); *see also* Mar. 22, 2011, email from Bosch employee to Volkswagen employees regarding analysis of failing CP4 fuel pumps, produced in response to NHTSA Inquiry EA11003EN-00639[0], available at https://static.nhtsa.gov/odi/inv/2011/INRD-EA11003-59428P.PDF (last accessed Aug. 8, 2019), at 11 (noting that Bosch was continuing to receive "a respectable number" of catastrophic failures of the CP4 pump in the U.S. in which Volkswagen dealerships were reporting "[m]etal particle[s] at the filter"); *id.* at 19-22 (spreadsheet showing results of Bosch's pre-analysis of HPFP failures in Volkswagen/Audi vehicles where "metal chips found in fuel system").

58.    Yet Ford went on to commission Bosch's CP4 fuel pump for use in its Power Stroke-engine vehicles, enticed by the prospect of a cheaper fuel injection pump than the CP4's predecessor.

**D.    Ford Decides to Equip its Diesel Power Stroke Engines with the Bosch CP4 Pump.**

59.    Since 1994, Ford has marketed a "Power Stroke" diesel engine.  The original "Power Stroke" engine was actually designed and manufactured by Navistar International, not Ford.  Ford relied on the expertise of Navistar, originally known as the International Harvester Company, from Chicago, Illinois, and re-branded the popular engine as its own.  The Navistar-produced "Power Stroke" engine enjoyed a reputation for reliability.  Ford utilized the Navistar 7.3L "Power Stroke" engine until the year 2003, and it enjoyed a reputation as possibly the best engine Navistar ever produced.

60.    Seeking to increase profits by cutting out the middle man, Ford began a partnership with Bosch in 2004 to design its own diesel engines.  Ford lacked experience designing modern diesel engines, but nevertheless chose an aggressive schedule to design and rush to market the 6.7L "PowerStroke" engine. Unbeknownst to consumers, this new "PowerStroke" engine contained the CP4 time bomb.

61.    The Class Vehicles also contain ineffective counter-measures such as the low-pressure water separation and filtration system.  Ford would use the potential

failure to maintain these counter-measures to blame consumers and deny warranty coverage, even when usually the water-in-fuel (WIF) light indicator was not triggered, even though all diesel contains water and Ford designed and manufactured the water separator and filtration system, and even when Ford knows that water and other corrosive and clogging substances can pass undetected through the system or overwhelm the system, resulting in CP4 damage and failures. Ford even erases the WIF history, so that vehicle owners cannot prove their lack of a "bad fuel" event, impeccable maintenance, or quick and appropriate response to any such event. It is thus clear that Ford is only interested in hiding its tracks and blaming the consumer for the poor durability of its trucks.

62. From the beginning, Ford was aware of a mismatch between Bosch's European fuel injection pumps and American diesel fuel at the pump. Ford was also alarmed at the high stakes of a pump failure if it were covered under warranty. In an email, a Ford fuel injection engineer referenced a trip to Germany to meet with Bosch and some photos that Bosch may share. The attachment to his email stated:

> U.S. diesel standards (ASTM D975) allow up to 500 ppm water content in fuel; European specifications (EN590) allow 200 ppm max. More variation in U.S. Consumer fuel sources and fuel quality vs. European markets—high volume truck stops vs. low volume neighborhood gas stations equipped w/diesel, use of off-road diesel fuel by some consumers, etc. . . . failure mode in one component, entire system (all injectors, pump, rails and lines) would

require replacement—major warranty expense component . . . .[24]

Ford was thus clearly aware of the need for a design margin to accommodate real world variations in fuel quality, and specifically in the U.S., whose standard is already borderline lubricity for the catastrophic failure of Bosch's European pump designs.

63.    In connection with this problem, in 2009, Ford was discussing the decreased lubricity of ULSD.  A November 17, 2009 email from Brien Fulton, Diesel Powertrain Systems Technical Specialist at Ford, to Beth Raney-Pablo from the Fuels and Lubricants Engineering Department at Ford stated: "[T]he data does contain some ULSD which due to the process to remove sulfur tends to reduce lubricity."  A November 13, 2009 email from Brien Fulton to Scott Eeley at Ford stated: "You need to be aware of the current fuel lubricity levels . . . we have lots of fuel above 520 [micrometers]."[25]

---

[24] Oct. 21, 2004, email from Ford Diesel Fuel Injection Systems Engineer Dave Eastman to Ford Diesel Powertrain Systems Technical Specialist Brien Fulton and Ford employee Mike Harrison re: "Water in Fuel Effects Paper," submitted by Ford to NHTSA in response to ODI Inquiry No. EA11003, document titled, "INRD-EA11003-50108P," available at https://static.nhtsa.gov/odi/inv/2011/INRD-EA11003-50108P.pdf (last accessed Aug. 7, 2019), at 148-49.

[25] Nov. 17, 2009, email chain involving Ford Diesel Powertrain Systems Technical Specialist Brien Fulton and other Ford employees re: "TLP09-117 Brief Report on HFRR Lubricity Evaluation of Diesel Fuels," submitted by Ford to NHTSA in response to ODI Inquiry No. EA11003, part of compilation of Ford fuel pump-related emails in "Appendix G" to Ford's Jan. 20, 2012 NHTSA submission (document titled "INRD-EA11003-50107P"), at 398-425. *See also id.* at 411 (from presentation slide headed, "Overview: North & South America Diesel Quality:"

64.     Further, Ford accepted the fact that U.S. diesel was "out of spec" for its high-pressure fuel pumps, but chose against hardware changes or design margins to match the fuel, acknowledging and rejecting a suggestion from Chevron in November 2009 that "Ford need[s] to change hardware to be more robust instead of counting on the fuel suppliers to improve quality, or ask for tighter lubricity specification."[26]

65.     It should have come as no surprise to Ford, then, when it began experiencing serious problems with the CP4 fuel pump in its 6.7L diesel-engine vehicles during the pre-production phase. *See, e.g.*, FORD_DIESEL_00005438, Dec. 1, 2009 email chain between Ford employees K. Pumford, S. Eeley *et al.* discussing ████████████████████████████████████████ ████████████████████████ FORD_DIESEL_00005223 and -5224, Jan. 29, 2010 email chain between Ford employees A. Radke, J. Rauch, B. Fulton, et al. re: ████████████████████████████████████████

_____

"North American fuels tend to have poorer lubricity and lower cetane[, whereas] South American fuels tend to have comparable lubricity to EU fuels.").

[26] Nov. 13, 2009, email from Chevron Ornite Company OEM & Industry Liaison Jerry C. Wang to Ford employees re: "TLP09-117 Brief Report on HFRR Lubricity Evaluation of Diesel Fuels," submitted by Ford to NHTSA in response to NHTSA ODI Inquiry No. EA11003, part of compilation of Ford fuel pump-related emails in "Appendix G" to Ford's Jan. 20, 2012 NHTSA submission (document titled "INRD-EA11003-50107P"), at 433. *See also id.* (emphasis added) (Wang presents another option to Ford, stating, "[T]his is an out of spec fuel issue so there is no need to change hardware and hope fuel quality will improve or ***just accept this as fact of life if the warranty is manageable***").

(discussing ███████████████████████████████████████████

██████████████).

66.     In September 2010, when Ford was still experiencing lubricity issues with its diesel HPFPs, Ford engineer Brien Fulton noted that, "Diesel fuel systems and water don't mix, even on the microscopic level."[27]

67.     Thus, it is clear that Ford was concerned about the lubricity and uniformity of American diesel for its engines, and was aware of the cost to the consumer if the injection pump were to catastrophically fail.

68.     In 2010, Ford began selling its own "PowerStroke" diesel engine. Under the leadership of Derrick Kuzak, group vice president of Global Product Development, Ford advertised that its "new diesel engine will deliver significant improvements in torque, horsepower, and fuel economy while adding more fueling flexibility." For 2011, Kuzak promised, "This all-new diesel engine has been so extensively tested both in the lab and in the real world that we're confident we're giving our customers the most reliable and productive powertrain available today."

---

[27] Sept. 17, 2010 email from Ford Diesel Powertrain Systems Technical Specialist Brien Fulton to Ford employees Robin Lawther, Forest Heggie, Karl Burroughs, and Carlos Armesto re: "High pressure fuel systems vs water in diesel fuel," submitted by Ford to NHTSA in response to ODI Inquiry No. EA11003, part of compilation of Ford fuel pump-related emails in "Appendix G" to Ford's Jan. 20, 2012 NHTSA submission (document titled "INRD-EA11003-50107P"), at 365-66.

"Our Super Duty customers demand reliability and durability . . . That's exactly what this engine delivers." [28]

69.     Yet, Ford's first attempt at designing a modern diesel engine was also rushed.  Kuzak admitted, "Developing an all-new engine is a big deal" but he claimed that Ford had been successful in the design "efficiently and quickly."[29]

70.     Ford claimed that the new Power Stroke engine was "backed by extensive laboratory and real world testing" and that it could utilize up to 20 percent Biodiesel (B-20).[30]     But Ford failed to realistically test its new engine with representative U.S. diesel, including a failure to adequately test for use with Biodiesel.

71.     On February 7, 2011, as the first models of the Class Vehicles were being sold, and in light of the disastrous CP4 failures European vehicles sold in the United States, NHTSA launched an investigative regarding a potential diesel-automotive-industry-wide defect in various automotive manufacturers' diesel high pressure fuel injection pumps, and roped Ford into that investigation.  But the failures of CP4 pumps were diluted or concealed because such investigation

_____

[28] *See* "A New Era in Ford Diesel Technology for Pickups Starts Now," Ford Social, available at: https://archive.li/eT10 (last accessed Aug. 7, 2019).

[29] *See* "A New Era in Ford Diesel Technology for Pickups Starts Now," Ford Social, available at: https://archive.li/eT10 (last accessed Aug. 7, 2019).

[30] *See* "A New Era in Ford Diesel Technology for Pickups Starts Now," Ford Social, available at: https://archive.li/eT10 (last accessed Aug. 7, 2019).

included non-CP4 equipped vehicles along with the first Ford trucks to contain the CP4 pump, which were still new at the time.[31]

72.     Nevertheless, on March 30, 2011, Ford internally activated a "Job Aid" for Ford dealers to address "2011 F-Super Duty vehicles equipped with a 6.7L diesel engine which . . . may have damaged fuel system components including the high pressure (HP) pump and fuel injectors. ***Fuel and additives which do not meet the minimum lubrication, cooling and anti-corrosion properties required by the high[-]pressure fuel system components*** may cause symptoms including, but not limited to, the following: crank/no start, long crank/hard start, rough run, low power, engine knocking, exhaust smoke and/or fuel rail pressure (FRP) slow to build."[32] These symptoms are known consequences of CP4 pump implosion.[33]

73.     Given the problems Ford saw pre-production with its CP4-equipped vehicles and U.S. diesel fuel, it should have come as no surprise to Ford when it encountered warranty problems due to catastrophic CP4 failures in the very first model-year of the 6.7L Power Stroke-engine trucks.[34] *See, e.g.,*

---

[31] The scope of the investigation under which Ford was incorporated included the 2008–2012 Super Duty F-Series trucks (NHTSA defect investigation EA11-003:NVS-213hkb).

[32] Ford Response to NHTSA Inquiry EA11-003, App'x F1, Global Concern Number 103-2011-0041, Activation Date 3/30/2011, available at FORD_DIESEL_00126408.

[33] *See, e.g.*, *infra* ¶¶ 81-85 (providing examples of CP4-related customer complaints in which drivers experience sudden engine shut off and inability to restart the vehicle).

[34] Indeed, Ford contemplated these very warranty issues during the pre-production phase. *See, e.g.*, FORD_DIESEL_00026201, Nov. 5, 2008 email between Ford employees P. Bruckner, K.

FORD_DIESEL_00014053, at -4054, June 2012 Ford presentation discussing

██████████████████████████████████████████

███████████████████████████████████ *id.* at -4055 (emphasis

added) ██████████████████████████████████████

█████████████████████████████

74.    Ford saw field incidents involving CP4 implosions in 2011 MY Ford F-Series trucks nearly as soon as the vehicles were off the assembly line. For example, in its January 2012 submission to NHTSA in response to ODI Inquiry No. EA11-003, Ford submitted records of more than one-hundred 2011 model year F-Series diesel trucks having experienced engine destruction due to the defective CP4 fuel pump—many of which Ford identified as "Root Cause: Poor lubricity fuel."[35]

75.    In this same January 2012 NHTSA submission, Ford represented the following: "Ford has ensured that the HPFP design in the peer vehicles is compatible with diesel fuels sold in the United States through engine and vehicle testing with

───────────────────

Pumford, *et al.* re: ████████████████████████████████ at -6201
(Bruckner stating, ████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████ .

[35] Ford Response to NHTSA Inquiry EA11-003, *supra* note 3, at App'x O.

the previously referenced diesel test fuels."[36] Ford also represented that, "[d]uring development of the 6.7L engine, Ford . . . addressed the risk of low lubricity fuel by specifying that HPFPs include a 'wear package' that the supplier [Bosch] had developed for pumps that were intended for use in markets where low lubricity fuel was known to be a concern."[37] This "wear package," if even implemented, was clearly ineffective, and there is simply no way that Ford's aforementioned engine and vehicle testing to "ensure[] that the HPFP design . . . is compatible with diesel fuels sold in the United States" did not show the CP4 pump failing when used with U.S. diesel fuel.

76. Ford was clearly on notice that the Bosch CP4 Pump in its vehicles was not compatible with American diesel fuel. Any reasonable person would think that Ford would utilize a more lubricated or robust pump design going forward, but they did not. The affected Ford vehicles containing the Bosch CP4 Pump are 2011–present model year Ford Pickups with 6.7L Power Stroke engines, and the owners are saddled with the expense of Ford's poor design choice. Ford doubled-down on its choice to use the CP4 as the heart of its diesel engines. Rather than replace it, Ford educated dealerships how to deceive customers convincing them that the devastating failures were caused instead by contaminated fuel.

---

[36] Ford Response to NHTSA Inquiry EA11-003, *supra* note 3, at 20.

[37] Ford Response to NHTSA Inquiry EA11-003, *supra* note 3, at 24.

77.     Moreover, Ford was on notice—and indeed, *admitted*—that high-pressure fuel pump failures pose an inherent risk to vehicle occupant safety. In August 2016, Ford conducted a safety recall for MY 2015–16 Ford Transit vans equipped with 3.2-liter diesel engines due to "[a] fuel injection pump malfunction" which "may cause the engine to not start or stall without warning and without the ability to restart."[38] Ford further acknowledged that "[a]n engine stall while driving, without warning or the ability to restart can increase the risk of a crash."[39]

78.     The federal Safety Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including claims relating to property damage received by the automotive manufacturer, warranty claims paid by the automotive manufacturer, consumer complaints, incidents involving injury or death, and field reports prepared by the automotive manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance issues.  49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21.

---

[38] *See* Aug. 22, 2016, Ford Part 573 Safety Recall Report for NHTSA Recall Campaign No. 16V-618, available at https://static.nhtsa.gov/odi/rcl/2016/RCLRPT-16V618-7678.PDF (last accessed Aug. 7, 2019); *see also* https://news.pickuptrucks.com/2016/08/recall-alert-2015-2016-ford-transit.html (last accessed Aug. 7, 2019).

[39] *Id.*

79.     The Safety Act further requires immediate action when a manufacturer determines or should determine that a safety defect exists.  *United States v. General Motors Corp.*, 574 F. Supp. 1047, 1050 (D.D.C. 1983).  A safety defect is defined by regulation to include any defect that creates an "unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle" or "unreasonable risk of death or injury in an accident."     49 U.S.C. § 30102(a)(8).  Within five days of learning about a safety defect, a manufacturer must notify NHTSA and provide a description of the vehicles potentially containing the defect, including "make, line, model year, [and] the inclusive dates (month and year) of manufacture," a description of how these vehicles differ from similar vehicles not included in the recall, and "a summary of all warranty claims, field or service reports, and other information" that formed the basis of the determination that the defect was safety related.  49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)-(c).  Then, "within a reasonable time" after deciding that a safety issue exists, the manufacturer must notify the owners of the defective vehicles.   49 C.F.R. §§ 577.5(a), 577.7(a).  Violating these notification requirements can result in a maximum civil penalty of $15,000,000.  49 U.S.C. § 30165(a)(1).

80.     To be sure, Ford has been put on notice of ***scores*** of consumer complaints regarding the now-notorious and catastrophic engine failure caused by CP4 pump failure.

81.    For example, on September 21, 2011, the following story was circulated on RV.net by one sorely disappointed owner of a 2011 F-350 6.7L Power Stroke diesel with only 35,000 miles:

To all my friends here at Rvnet[:]

I see my issues with my fuel system have traveled to Rvnet. I would have started a thread earlier in the saga but have been very busy. This should have been a simple situation to fix. It has turned into a circus.

Here is the link to the story. It has escalated into an epic event:

http://www.ford-trucks.com/forums/1099978-painful-an-update.html

I wanted to know the facts of the failure before I brought the story here. I wanted to keep rampant speculation and unnecessary commentary out of the discussion. It is really an unfortunate turn of events. The cliff's notes version is as follows:

Truck quit like the key was turned off. It was a Saturday[.]

Ford Roadside assistance towed it to the nearest open Ford facility[.]

This dealer began the service work late on Monday morning.

According to them their diagnostics led them to replace the fuel rail pressure sensor. After waiting a day for the part...still no start[.]

According to them, further diagnostics then led them to the fuel injection control module. The part will be in on Friday

afternoon and we will get it out the door before we close...wrong again.

There has been no mention of contaminated fuel up to this point. This is a huge deal because fuel samples should have been taken before any fuel system work was attempted. Now the dealer has 3 days of work where he can not recover any warranty money. Anyone see what's coming?

Now the dealership dance starts. They claim fuel contamination and tell me I am paying. On Monday, they contacted the Ford tech hotline with an exaggerated story about water in the fuel.

I called Ford customer care. After 2.5 hours of discussion over the course of Monday afternoon, I was summarily dismissed with the admonition that the bill for the repairs would be mine. My request to talk to an upper level customer service manger was refused.

I removed the truck from the non servicing dealer. I can not tell you how much fun that was. I had it towed 75 miles to my servicing dealer.

They have begun work on the truck. There is no evidence of water penetration beyond the water separator/primary fuel filter. There was less than 2 ounces of water removed from the separator...if that is where it actually was found...they captured the sample in used drinking water bottles. The under hood secondary filter shows no evidence of ever having water in it. The parts they said were damaged with rust have no signs of rust.

The high pressure fuel pump is toast. There is no evidence present showing water contamination...or any other form of                                          contamination.

Now we wait for the Ford Field Service Engineer . . . .  I

- 52 -

am not confident at all that this will be resolved in a fashion that makes me whole."[40]

82.     Then, the following day, this same user posted an update, which read as follows:

> Well, another day has slipped by in my ongoing attempt to get my truck fixed under warranty. It has been 12 days since the truck quit. There have been some developments.
>
> First, my dealer has decided that this is unquestionably a warranty repair. His repair and service records on the truck indicate no history of water being found in the separator when they worked on the truck. There can be no long term water presence to do the type of damage that the non servicing dealer tried to claim. Ford technical documents with pictures showing the type of water and rust damage required to void warranty show parts exponentially more damaged than one might expect. My parts show no such damage.
>
> The Ford tech hotline is not cooperating with my dealer. They have refused to send out a Field Service Engineer . . . ."[41]

83.     Five years later, this same F-350 owner posts again to his original "Open Roads" enthusiasts forum now that the CP4 issue has gone viral, stating the following (after summarizing his 2011 debacle):

_____

[40] *My Big Ford Drum is Broke*, RV.NET, Sept. 21, 2011, available at http://www.rv.net/forum/index.cfm/fuseaction/thread/tid/25428988.cfm (last accessed Aug. 7, 2019).

[41] *Id.*

"The real cost to fix this problem, at least with Ford, is over $10,000...my repair was $10,300 . . . and if you do not make these repairs to Ford's specification (replace everything but the tank) the engine warranty is flagged[)]. [S]eeing that Ford does not fix many of them under warranty anyway rends that position moot[.]

"I close this missive with a comment made to me during my Ford ordeal by the lead engineer at Ford for the 6.7 engine project...paraphrasing for brevity...'I was at Bosch the other day. I walked by two pallets full of failed CP4 pump returns...one Ford and one GM...looked about the same size pile of each...'"[42]

84. In a similar vein, on August 1, 2016, the owner of a 2015 Ford F-350 Supercab submitted the following complaint to NHTSA regarding the defective condition:

> 2015 F350 6.7 DIESEL WITH 46,000 MILES THAT IS DOWN BECAUSE HPOP IS DEFECTIVE AND SPREADING MEDAL THROUGH SYSTEM. FORD HAS INSPECTED AND SAID IT IS BECAUSE OF WATER IN FUEL, EVEN THOUGH NO WARNING LIGHTS OR CODES ARE AVAILABLE. FORD PULLED SENSORS OUT OF ENGINE AND REJECTED REPAIR BECAUSE OF TARNISH ON SENSORS. THE ONLY CODES WERE FOR (LOW FUEL PRESSURE & REDUCED POWER). NO OTHER CODES. INITIAL INSPECTION REVEALED ABOUT 3/4 INCH OF WATER IN WATER SEPARATOR BUT NO LIGHT OR CODE. THE WARNINGS OCCURRED WHEN TRUCK WAS STARTED AND IT RAN ABOUT 100 FT BEFORE BEING SHUTDOWN AND TOWED

---

[42] *2011 Duramax and up fuel pump problems*, OPEN ROADS FORUM, Jan. 22, 2016, available at https://forums.trailerlife.com/index.cfm/fuseaction/thread/tid/28726814/print/true.cfm(last accessed Aug. 7, 2019) (ellipses in original).

TO DEALERSHIP. THIS APPEARS TO BE A COMMON PROBLEM SINCE FORD OFFERS A REPAIR KIT FOR THIS ISSUE. TOTAL COST OF REPAIR IS BETWEEN $9500,00 & $12,500 DOLLARS AND THIS ON A TRUCK WHICH IS STILL UNDER WARRANTY THAT FORD WILL NOT HONOR. THE TRUCK WASN'T A YEAR OLD UNTIL MAY 2016 AND HAS BEEN DOWN FOR OVER FOUR MONTHS BECAUSE FORD WILL NOT REPAIR. THIS IS THE BOSCH C4 SERIES PUMP. *BF *TR[43]

85.    Indeed, Ford is notorious for blaming consumers for this catastrophic failure and blatantly refusing to take responsibility for its own defective vehicle design.  By way of example, see the following non-exhaustive list of complaints that consumers have filed with NHTSA regarding the same exact CP4-fueled issue occurring over and over again in Ford diesel vehicles:

- Mar. 21, 2014, 2013 Ford F-250 Supercab customer complaint filed with NHTSA:

    HAD CHECK ENGINE LIGHT COME ON. BROUGHT TO FORD SERVICE 3 TIMES. THE LAST TIME THEY QUOTED ME 11,145 TO FIX SAYING WATER WAS IN FUEL. I THOUGHT IT WAS UNDER WARRANTY, WHICH THEY CLAIM IT IS NOT. MY INSURANCE COMPANY SENT BY AN ENGINEER, WHICH HE SENT FUEL TO INDEPENDENT LAB. FUEL RESULTS CAME BACK NEGATIVE FOR EXCESSIVE FUEL. TRUCK HAS BEEN AT SERVICE CENTER FOR 1 MONTH, WITH NO RESULTS. *TR"[44]

---

[43] NHTSA ID No. 10892303.

[44] NHTSA ID No. 10576017.

- Jan. 9, 2014, 2013 Ford F-250 Supercab customer complaint filed with NHTSA:

  > "VEHICLE STALLED AND STOPPED RUNNING IN TRAFFIC ON HIGHWAY 231 IN MONTGOMERY AL. . . . CALLED FORD ROADSIDE ASSIST. I HAVE 125K EXTENDED WARRANTY AND HAD VEHICLE TOWED TO NEAREST FORD DEALERSHIP . . . . VEHICLE WAS DIAGNOSED WITH 'EVIDENCE OF WATER IN FUEL SYSTEM[.'] THERE WAS NO WATER PRESENT IN SYSTEM, NO 'WATER IN FUEL SYSTEM' WARNING LIGHT HAS [EVER] LIT UP ON THIS VEHICLE, HAD IT CHECKED IN THE PAST, WAS TOLD WAS FUNCTIONAL, WAS TOLD REPAIRS WERE 'NOT COVERED' . . . . THE REPAIRS ARE MORE THAN I CAN AFFORD FOR A TRUCK THAT IS UNDER WARRANTY. THIS IS CLEARLY A SYSTEM FAILURE. *TR"[45]

- Feb. 12, 2014, 2011 Ford F-350 Supercrew customer complaint filed with NHTSA:

  > "THE ENGINE LIGHT CAME ON TODAY IN MY 2011 F350 DIESEL. DEALER SAYS DEF PUMP ERROR CODE. DEALER SAYS NO PUMPS AVAILABLE UNTIL 03/15/2014. I THINK FORD SHOULD ISSUE A SERVICE BULLETIN. DEALER SAYS NO WARRANTY. DEALER STATES TRUCK WILL SHUT DOWN AT ANY TIME. THIS SHOULD BECOME A RECALL ISSUE WITH THE NHTSA. OWNERS OF THESE TRUCKS TOW TRAILERS FREQUENTLY WITH LENGTHS IN EXCESS OF 36'. HAVING A TOW VEHICLE SHUT DOWN IN TRAFFIC AT HIGHWAY SPEEDS IS EMINENTLY DANGEROUS AND WILL CAUSE FATALITIES

---

[45] NHTSA ID No. 10559221.

REFER TO NHTSA CAMPAIGN NUMBER: 13V535000 ON SIMILAR VEHICLES. *TR"[46]

- May 23, 2014, 2011 Ford F-350 Supercrew customer complaint filed with NHTSA:

> "THIS DIESEL TRUCK WAS BEING DRIVEN AT 20 MPH WHEN WITHOUT ANY WARNING, THE ENGINE SHUT OFF RESULTING IN LOSS OF ALL POWER STEERING AND BRAKES. WOULD NOT RESTART. TOWED TO DEALER SERVICE. DEALER DIAGNOSED LACK OF FUEL PRESSURE AND THEY OBSERVED METAL SHAVINGS IN THE LOWER FILTER INDICATING THE HPFP WAS DISINTEGRATING. DEALER SUBMITTED PICTURES OF THE FLOW CONTROL VALVE TO FORD WARRANTY PRIOR APPROVAL PER SERVICE MANUAL DIRECTIONS. DEALER OBSERVATION WAS THAT THEY OBSERVED NO SIGNIFICANT WATER OR DEBRIS CONTAMINATION IN THE FUEL FILTER. PRIOR APPROVAL RESPONSE WAS THAT THE PICTURES SUBMITTED WERE REPRESENTATIVE OF FUEL CONTAMINATION AND DENIED THE WARRANTY COVERAGE FOR THE REPAIR. NO WATER IN FUEL INDICATION WAS EVER SEEN BY OWNER. FILTERS MAINTAINED PER MAINTENANCE SCHEDULE. BILL FOR REPAIR IS ESTIMATED AT APPROX $11,000.
> "TWO WEEKS PRIOR, THIS VEHICLE WAS TOWING A 14K LB 5TH WHEEL DOWN THE SANTIAM PASS IN OREGON. STEEP INCLINES, SHARP DROP OFFS, AND SNOW ON THE ROAD. A SUDDEN LOSS OF POWER WITHOUT WARNING WOULD VERY LIKELY HAVE RESULTED IN LOSS OF CONTROL OF THE VEHICLE, SEVERE BODILY INJURY, OR DEATH. IT APPEARS THE BOSCH CP4

---

[46] NHTSA ID No. 10563967.

FUEL PUMP WAS NOT DESIGNED TO OPERATE WITH THE 560 SCAR FUEL LUBRICITY OF US FUELS AND THAT FORD IS BLAMING PUMP FAILURES ON WATER CONTAMINATION BY OBSERVATION OF A CORROSION APPEARANCE ON ANOTHER COMPONENT. WARRANTY COVERAGE WAS DENIED WITHOUT ANY OBSERVATION OF THE FUEL PUMP ITSELF. NOTE THAT NO INDICATION THAT ANYTHING WAS WRONG WITH THE TRUCK WAS OBSERVED PRIOR TO THE FAILURE. THE TRUCK IS EQUIPPED WITH A FACTORY 5TH WHEEL HITCH AND IS INTENDED TO HAUL UP TO 21.5K LB TRAILERS. SUDDEN LOSS OF POWER STEERING AND BRAKES WITHOUT WARNING UNDER THIS INTENDED USE IS EXTREMELY DANGEROUS. *TR"[47]

- Aug. 14, 2014, 2013 Ford F-350 Supercrew customer complaint filed with NHTSA:

  "I WAS DRIVING IN MY NEIGHBORHOOD AT ABOUT 25 MPH AND THE ENGINE QUIT, AND WOULD NOT RESTART!! [ . . . ] THE TRUCK HAD TO BE TOWED TO THE DEALER AND IT HAS [BEEN] THERE FOR OVER A WEEK AND THEY CALLED YESTERDAY AND TOLD ME THERE WERE METAL SHAVINGS IN THE FUEL PUMP AND I DO NOT KNOW IF THE METAL SHAVINGS GOT INTO THE OIL SYSTEM TO RUIN THE ENGINE!! *TR"[48]

- Dec. 9, 2014, 2012 Ford F-250 Supercrew customer complaint filed with NHTSA:

  "TL* THE CONTACT OWNS A 2012 FORD F-250 SD. THE CONTACT STATED THAT WHILE DRIVING

---

[47] NHTSA ID No. 10593571.

[48] NHTSA ID No. 10622326.

APPROXIMATELY 63 MPH, THE REDUCED POWER AND THE CHECK ENGINE WARNING LIGHTS ILLUMINATED. THE VEHICLE WAS TOWED TO A SECOND DEALER, WHO DIAGNOSED THAT THERE WAS AN UNKNOWN SUBSTANCE IN THE FUEL TANK. THE VEHICLE WAS NOT REPAIRED . . . . THE APPROXIMATE FAILURE MILEAGE WAS 18,877."[49]

**E.    Supposed "Remedies" are Insufficient and Costly.**

86.    Because of its incompatibility with U.S. diesel fuel, CP4 pumps and corresponding fuel injection systems, even when replaced or "fixed," will continue to fail in the Class Vehicles. Indeed, in a June 2010 email chain between Bosch and representatives of Audi and Volkswagen regarding the catastrophic failure of a CP4 pump in a 2010 Audi A3 TDI, Audi asked Bosch, "[W]hy are the defects mentioned below still present after replacing the high-pressure pump and the injector? What could the [dealer] have done wrong by way of incorrect repair so that such defects are appearing?" Bosch responded that "In this case the complete fuel system (HPP, rail, injectors, **all** lines) need to be changed . . . .  I assume that because of the 'cruncher,' the entire system is contaminated with chips, which are then pumped in circulation and can soon lead to the next failure! The rough running can be explained

---

[49] NHTSA ID No. 10663076.

by the fact that a chip is already present before or in the injector and is impairing its function."[50]

87.    The Bosch CP4 Pump problem is so prevalent that several independent parts suppliers now provide kits to mitigate the inevitable harm. "Disaster Preventer Kits" (or "bypass kits") usually refer to a fuel bypass system that does not prevent the failure, the loss of the expensive injection pump, or the need to clean metal shavings from the fuel system. But these kits are designed to redirect the lubricating fuel for the CP4 back to the fuel tank, so that it will be filtered before it returns to the engine. The bypass kit directs the fuel contaminated with metal shavings into the gas tank, which is less expensive to clean than the engine and high-pressure fuel system—in other words, a Band-Aid solution. These bypass kits are also less expensive than more complete remedies, requiring only $300-$400 in parts, and are marketed as having the ability to "[k]eep[] injectors/rails safe from CP4 pump failure debris."[51] Many consumers have turned to this sort of remedy preemptively due to the known impending failures their vehicles are facing.

_____

[50] March 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 79-80 (June 7-9, 2010 email chain between Bosch, Audi, and Volkswagen representatives regarding CP4 fuel pump failure falsely attributed to "misfuel").

[51] Online sales listing for "Ford 6.7 CP4.2 bypass kit (2011+)," S&S DIESEL MOTORSPORT, available at https://ssdiesel.com/shop/all/ford-6-7-cp4-2-bypass-kit-2011/ (last accessed Aug. 7, 2019).

88.     Another way to mitigate the damage is to spend money for fuel additives to increase the lubricity of the fuel.  This approach may work best in conjunction with the previously discussed modifications, but even by itself, it can be expensive.

89.     In short, there is no known way to remedy or mitigate CP4 pump failure without decreasing the fuel efficiency promised to Plaintiffs and other Class Members and without significant expense to Plaintiffs and other Class Members. Accordingly, Plaintiffs' reasonable—but ultimately mistaken—reliance on Ford's (now-suspect) "Built Ford Tough" commercial identity epitomizes the reason for which they paid a premium; it was commercially reasonable to so do, from consumers' collective perspective.  In reality, Ford has acted unconscionably in the consumer context, especially in light of consumers' highly disparate bargaining position(s) going into the subject Class Vehicle transactions, of which Ford has taken advantage to a grossly unfair and profit-driven degree.

**F.      Ford Knew Durability and Superiority Were Material to Consumers and Made Hollow Promises of Durability and Superiority.**

90.     Ford's 2011 Super Duty truck brochures for the 6.7L Power Stroke engine equipped vehicles emphasized the "impressive fuel economy" and

"DURABILITY: Super duty is built to the extremely high standards of durability and reliability you'd expect in a full-size pickup that's Built Ford Tough."[52]

91.    This same brochure also touted how the 2011 Ford Super Duty's 6.7L Power Stroke diesel engine provided the "BEST DIESEL fuel economy, power and torque IN THE CLASS," with a "**20% IMPROVEMENT IN FUEL ECONOMY** over the previous model, making it the best in its class:"[53]

---

[52]    2011    Ford    Super    Duty    Brochure,    at    2,    available    at
https://www.ford.com/services/assets/Brochure?make=Ford&model=SuperDuty&year=2011&p
ostalCode=55401 (last accessed Aug. 7, 2019).

[53] *Id.* at 5.



92.    Ford similarly touted its 2012 Super Duty 6.7L Power Stroke diesel trucks as "delivering up to a 20% improvement in fuel economy over the previous generation, making it the best in its class:"[54]

---

[54] 2012 Ford Super Duty Brochure, at 7, available at http://www.legacydirect.com/brochures/2012_ford_superduty.pdf (last accessed Aug.7, 2019).





93. Similarly, in its advertising materials for the 2013 Ford Super Duty 6.7L Power Stroke diesel truck, Ford noted that, "This Super Duty® has endured

more torture testing than any previous generation of Ford Truck—including over 10 million cumulative miles on the most tested Power Stroke® diesel engine ever."[55]

94.     The brochure specifically touts Ford's 2013 6.7L Power Stroke Diesel truck as having "[b]est-in-class horsepower, torque and fuel economy," explaining that the truck "delivers 400 hp, 800 lb.-ft of torque, and up to a 20% improvement in fuel economy over the previous generation, making it the best in its class[:]"[56]

---

[55]     2013 Ford Super Duty Brochure, at 4, available at https://www.ford.com/services/assets/Brochure?make=Ford&model=SuperDuty&year=2013&postalCode=11738 (last accessed Aug. 7, 2019).

[56] *Id.* at 5.



**DIESEL BEATS THE COMPETITION 3 TIMES OVER.**

Best-in-class horsepower, torque and fuel economy! The 6.7L Power Stroke® V8 Turbo Diesel gives you all 3. With this advanced engine, Super Duty® delivers 400 hp, 800 lb.-ft. of torque, and up to a 20% improvement in fuel economy over the previous generation, making it the best in its class. Designed, engineered and built by Ford, the 6.7L features many innovative details including aluminum cylinder heads with precision dual water jackets that help minimize weight and maximize cooling. It's also the most tested Power Stroke diesel ever. This B20-capable engine has proven itself in over 10 million miles of cumulative testing under extreme conditions from 120ºF scorching heat to -40ºF bone-chilling cold. It's Built Ford Tough®

**Cleanest Super Duty diesel ever.** This engine generation utilizes industry-proven technology and innovative Ford strategies to meet the latest federal emissions standards – reducing nitrogen oxide (NOx) levels by more than 80% compared to the previous-generation diesel. For your part, just watch for a low diesel exhaust fluid (DEF) alert in the vehicle's message center, then locate the blue DEF fill cap and replenish the DEF supply. The reservoir holds 5 gallons of Ford-approved DEF, which can be purchased from your Ford dealer or other authorized retailers.

**Delivers maximum power quickly.** The diesel engine's class-exclusive single-sequential turbocharger features the compact, efficient design of a dual-sided compressor wheel.

**Powers upfits any time the engine's running.** Whether you're in motion or at a complete stop, you can power your upfits with the diesel and our class-exclusive live-drive power take-off (PTO) provision.² It keeps the job going with an output gear linked directly to the engine crankshaft.

**Standard TorqShift® 6-speed SelectShift Automatic.®** This rugged transmission is also designed, engineered and built by the Ford powertrain team. Its torque converter includes low-speed lockup capability (down to 900 rpm), which enables the engine to run efficiently at lower rpm. The high-strength sinter-metal carrier, with its patented Ford clutch one-way clutch, easily handles the extreme low-end torque of the diesel engine, as well as the high speeds of the gas engine. Plus, a high-capacity, high-efficiency fluid filter extends your fluid- and filter-change intervals up to 150,000 miles.



¹Based on Ford drive-cycle tests of comparably equipped 2011/2012 Ford and 2011/2012 competitive models. ²Available feature.

2013 SUPER DUTY®
ford.com

BUILT Ford TOUGH®

95.     Once again, in 2014, Ford proclaimed that its 6.7L diesel Power Stroke

was "[t]he diesel leader on 3 fronts," including "[b]est-in-class fuel economy[,]

[b]est-in-class 400 horsepower[,] [a]nd best-in-class 800-lb.-ft. of standard torque," with "innovative details that contribute to its durability:"[57]



96.    In its 2015 Super Duty brochure, Ford proclaimed that the 6.7L Power Stroke diesel truck had been "[p]roven in over 12 million miles of cumulative testing and real-world use under extreme conditions," making it "the most tested Power Stroke diesel ever."[58] Likewise, Ford's television advertisement for the 2015 Ford

---

[57]    2014 Ford Super Duty Brochure, at 4, available at http://cdn.dealereprocess.net/cdn/brochures/ford/2014-f250superduty.pdf (last accessed Aug. 7, 2019).

[58]    2015 Ford Super Duty Brochure, at 4, available at https://www.ford.com/services/assets/Brochure?make=Ford&model=SuperDuty&year=2015 (last accessed Aug. 7, 2019).

Super Duty touted its "main ingredient"—the "Ford Super Duty 2nd Generation 6.7 Liter Power Stroke Diesel"—as giving the vehicle "the most horsepower and the most torque in its class."[59]

97.    In fact, Ford has represented ***in every single one of its television advertisements*** that Ford Super-Duty vehicles are fit for driving on American roadways, by featuring the Class Vehicles ***driving on American roadways***. For example, in its 2015 "Ford Super Duty Challenge" television advertisements, numerous Class Vehicles are seen traversing all sorts of American terrain as if they are all adequately drivable and compatible with American diesel fuel:[60]



---

[59] 2015 Ford Super Duty Television Advertisement, last aired Dec. 28, 2014, available at https://www.ispot.tv/ad/7jGb/2015-ford-super-duty-main-ingredient (last accessed Aug. 8, 2019).

[60] 2015 "Ford Super Duty Challenge" Television Advertisement, available at https://www.ispot.tv/ad/7icj/2015-ford-super-duty-super-duty-challenge (last accessed Aug. 8, 2019).









98. Literally, every single Ford advertisement featuring the Class Vehicles falsely demonstrates that the Class Vehicles are compatible with American fuel, ***but they are not.***

99.     In Ford's 2016 Super Duty brochure, Ford touted its 6.7L Power Stroke diesel trucks by proclaiming that, "**Best-in-class diesel fuel economy** is maintained with the help of high-pressure fuel injectors that achieve a clean, efficient burn" – and once again, the vehicle is shown *driving* in this *American* advertisement:[61]






---

[61]     2016 Ford Super Duty Brochure, at 5, available at https://www.ford.com/services/assets/Brochure?make=Ford&model=SuperDuty&year=2016&postalCode=15001 (last accessed Aug. 7, 2019).

100.   The following year, Ford proclaimed that its 2017 6.7L Power Stroke diesel truck was "the strongest [] yet" and "[t]he most tested Power Stroke diesel ever," with "class-best 925 LB.-FT. torque" and "unsurpassed diesel fuel economy"—and once again, the Class Vehicle is driving problem-free in this American advertisement:[62]



101.   Ford's television ads for the 2017 Super Duty similarly featured the Class Vehicles driving across all sorts of American terrain, with a voiceover telling

[62] 2017 Ford Super Duty Brochure, at 7, available at https://www.ford.com/services/assets/Brochure?bodystyle=Truck&make=Ford&model=SuperDuty&year=2017 (last accessed Aug. 7, 2019).